**Page 1**

```
09:50AM   1            IN THE UNITED STATES DISTRICT COURT
                         FOR THE DISTRICT OF KANSAS
          2
            BAC LOCAL UNION 15 WELFARE  )  CASE NO. 2:16-CV-2242
          3 FUND, et al.,               )
                                        )
          4        Plaintiffs,          )
                                        )
          5   vs.                       )       DEPOSITION
                                        )
          6 WILLIAMS RESTORATION COMPANY,)
            INC., and FOX HOLDINGS, INC.,)
          7                             )
                                        )
          8        Defendants.          )

          9

         10

         11        DEPOSITION OF JEFFERY A. WILLIAMS taken before

         12 Jean M. Schleife, Registered Professional Reporter and

         13 General Notary Public in and for the State of Nebraska,

         14 at 10:01 a.m. on December 8, 2017, at the law offices of

         15 Koley Jessen, 1125 South 103rd Street, Suite 800, Omaha,

         16 Nebraska, taken on behalf of defendant Fox Holdings,

         17 pursuant to the Federal Rules of Civil Procedure and the

         18 within stipulations.

         19

         20

         21

         22

         23              Jean M. Schleife, CSR
                      Matheson-Taulborg-Denney-Schleife
         24                7602 Pacific Street
                          Omaha, Nebraska  68114
         25            402/397-9669 - 402/680-3885
```

**Page 3**

| No. | | Identified |
|---|---|---|
| 4 | 2014 job list | 69 |
| 5 | Agreement | 73 |
| 9 | 5-4-15 letter to Williams | 66 |
| 12 | Email chain | 43 |
| 13 | Contract with union | 47 |
| 14 | Asset purchase agreement | 49 |
| 15 | First National Bank statements | 64 |
| 16 | First National Bank statements | 64 |
| 17 | Williams Restoration summary of services | 79 |
| 18 | 5-6-15 Stupar letter to Williams | 89 |
| 19 | Nebraska DMV title receipts | 92 |
| 20 | Asset purchase agreement | 100 |
| 21 | Email re assumption of liabilities | 102 |
| 22 | Spreadsheet with assets purchased | 103 |
| 23 | Email chain | 104 |
| 24 | Spreadsheet of customer and job list | 126 |
| 25 | Fringe benefit funds | 145 |

EXHIBITS

* * * * *

**Page 2**

```
          1              APPEARANCES

          2 Bradley J. Sollars
            Suite 2001
          3 1100 Main Street
            Kansas City, Missouri  64105-5178
          4        On behalf of plaintiffs

          5 Patrice D. Ott
            Suite 800.
          6 1125 South 103rd Street
            Omaha, Nebraska 68124-1079
          7        On behalf of defendant Williams Restoration

          8 Bonnie M. Boryca
            Suite 100
          9 10330 Regency Parkway Drive
            Omaha, Nebraska  68114
         10        On behalf of defendant Fox Holdings

         11

         12         I N D E X
                                              Page
         13
            Direct examination by Ms. Boryca      4
         14 Cross-examination by Mr. Sollars     75
            Redirect examination by Ms. Boryca  148
         15 Recross-examination by Mr. Sollars  154
            Further redirect examination by Ms. Boryca 155
         16
```

**Page 4**

JEFFERY A. WILLIAMS

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MS. BORYCA:

Q.  Can you state your full name, please.

A.  Jeffery A. Williams.

Q.  Were do you live?

A.  8633 South 98th Circle, La Vista, Nebraska.

Q.  How long have you lived there?

A.  Approximately 18 years.

Q.  And are you originally from Omaha, this area?

A.  Yeah.  I was born here, yes.

Q.  And what's your date of birth?

A.  5-19-66.

Q.  Highest level of education that you've obtained?

A.  College.

Q.  And was that here in Nebraska?

A.  Yeah.

Q.  Where at?

A.  Metro.

Q.  And what degree did you obtain?

A.  I didn't finish, but business is what I was going for.

Q.  Have you had other kinds of training or education

besides the courses at Metro?

5

1  A.  No.
2  Q.  Training in a trade, for instance?
3  A.  Yeah. I guess, yeah.
4  Q.  Tell me about that.
5  A.  Bricklaying school.
6  Q.  Was that through the local union here?
7  A.  Correct.
8  Q.  And can you give me an approximate time period for when
9      you went through that training process?
10 A.  Probably 1988, and it was a one-year.
11 Q.  One-year program?
12 A.  Yeah, for about a year.
13 Q.  Have you ever had your deposition taken before?
14 A.  I don't believe so.
15 Q.  Have you ever been a party to a lawsuit before this
16     lawsuit today?
17 A.  No.
18 Q.  How about any testimony in court in other cases?
19 A.  No.
20 Q.  Did you do anything to prepare for your deposition
21     today?
22 A.  Just read through some of the documents.
23 Q.  Do you recall what kinds of documents you read through?
24 A.  The affidavits for the NLRB, International Labor Board.
25 Q.  Any other types of documents?

6

1  A.  No.
2  Q.  And do you recall which affidavits or of who?
3  A.  Jordan Fox and Linda Fox and Craig Hydeman's
4      deposition.
5  Q.  You mean affidavit?
6  A.  Yeah. Whichever, yeah.
7  Q.  Well, we've gotten a good start. We're going to spend
8      a couple hours here, and I think Mr. Sollars might have
9      some questions for you as well. I want to just make
10     sure you kind of understand the process for today.
11 A.  Okay.
12 Q.  So you're under oath here, obviously. You understand
13     you're obligated to tell the truth, right?
14 A.  Correct.
15 Q.  And obviously I'm asking the questions, and you're
16     giving the answers, just as we're doing. I'd ask you
17     to do your best not to interrupt me as I ask a
18     question. Wait for me to complete my question before
19     you give your answer. Does that sound fair?
20 A.  Sure.
21 Q.  And I may remind you if we start to kind of talk over
22     each other, and I might do it, too, but I do that just
23     so once it's taken down and typed out we have a clear
24     record of what I'm asking and what you're saying.
25     Okay?

7

1  A.  Okay.
2  Q.  Is there anything about today that would make it
3      difficult for you to remember things or for you to be
4      able to understand my questions today?
5  A.  No.
6  Q.  You're not on any kind of medications where you've
7      received instructions that it might affect your ability
8      to understand in any way, correct?
9  A.  No.
10 Q.  Can you tell me what your current occupation is.
11 A.  Bricklayer.
12 Q.  And who do you work for?
13 A.  I work part time for McGill Restoration.
14 Q.  And when you say part time, can you estimate for me the
15     typical amount of hours you work in a week?
16 A.  Twenty.
17 Q.  How long have you been working part time for McGill
18     Restoration?
19 A.  I started this fall, so August.
20 Q.  And can you kind of tell me generally how that came
21     about. Did you know someone there?
22 A.  I do.
23 Q.  How did you learn about the job or come into the
24     position?
25 A.  I have a friend that works for Tim McGill, and Tim

8

1      McGill and I have been friends for years, so they just
2      kind of introduced us, or he asked me if I wanted to
3      work on a job, and I said yeah.
4  Q.  Was it a particular job that they came to you asking
5      about?
6  A.  Western Heritage Museum.
7  Q.  Have you worked on other jobs besides that?
8  A.  I'd worked on one other job, it was a church, just for
9      a day.
10 Q.  So this week, for instance, have you worked this week?
11 A.  No. They shut that job down probably the end of
12     October, so I haven't worked for them since then, but
13     I'll start back up with them this spring.
14 Q.  And why is it that you haven't worked since the end of
15     October?
16 A.  I don't need to work.
17 Q.  Why is that?
18 A.  I have other stuff to do. I own real estate and stuff
19     like that.
20 Q.  You have other ways of earning income, I take it?
21 A.  Yes.
22 Q.  So one is that you own some real estate?
23 A.  Yeah. I own commercial properties.
24 Q.  Is that through a company, or you own those
25     individually?

**13**

1     Union?

2  **A.**  **Correct.**

3  **Q.**  What was the reason for that?

4  **A.**  **I have no reason to be in it. I was doing roofing.**

5     **It's not their work. So I wasn't going to get paid**

6     **benefits for it, so no reason to stay in it.**

7  **Q.**  And then have you since leaving the union rejoined the

8     union at any point?

9  **A.**  **I did when I started working for Williams Refractory.**

10  **Q.**  And can you kind of peg a time on that, approximately?

11  **A.**  **I really can't.**

12  **Q.**  How long do you think you stayed at Weidner?

13  **A.**  **I worked for them for approximately I want to say ten**

14     **years off and on, and I worked for Williams in between**

15     **there, too.**

16  **Q.**  Do you think it was sometime in the mid '90s that you

17     rejoined the union?

18  **A.**  **Perhaps.**

19  **Q.**  Back 20 years ago?

20  **A.**  **I don't know. I have 27 years in with the union.**

21  **Q.**  Are you a member presently?

22  **A.**  **Yes.**

23  **Q.**  Was your father a member of the union?

24  **A.**  **Yes.**

25  **Q.**  When you owned Williams Restoration, did you ever have

**14**

1     any kind of negotiations on contracts with the union?

2  **A.**  **Yes.**

3  **Q.**  What types of contracts?

4  **A.**  **I wasn't -- let me rephrase that. I did not sit in**

5     **contract stuff with them. They basically come in.**

6     **They have a group of five contractors that negotiate**

7     **with the union. I was not one of those.**

8  **Q.**  I want to make sure I kind of understand. So you know

9     of five other contractors in the Omaha area that did

10     negotiate contracts with the local union; is that

11     right?

12  **A.**  **Correct.**

13  **Q.**  Do you know off the top of your head the five

14     contractors you're thinking of?

15  **A.**  **I know Duffy Brothers and McGill Restoration, I think**

16     **Karl Kehm and Seedorff, and there might have been**

17     **another one in there, too. I'm not sure. Like I say,**

18     **I wasn't privy to those.**

19  **Q.**  And you just know about this just from what you've

20     heard kind of from others in the industry while

21     working; is that fair?

22  **A.**  **Correct.**

23  **Q.**  And so are we talking about negotiation like a

24     collective bargaining agreement with the union?

25  **A.**  **I assume that's what they're doing, yes.**

**15**

1  **Q.**  And then timing-wise, about when was this taking place,

2     do you think?

3  **A.**  **I would say it was probably right before the contract**

4     **expires, while they were negotiating the new one, their**

5     **three-year term. Like I say, I'm not privy to all**

6     **this, so I don't really know approximately.**

7  **Q.**  You've heard about this happening more than once?

8  **A.**  **Correct. It happens every three years or whenever the**

9     **contract expires.**

10  **Q.**  You yourself never participated in any kind of

11     negotiation on terms of a contract with the union; is

12     that correct?

13  **A.**  **Correct.**

14  **Q.**  And how about your father? Do you know if he ever did

15     that?

16  **A.**  **No.**

17  **Q.**  He did not do that?

18  **A.**  **No.**

19  **Q.**  In operating Williams Restoration Company did you have

20     any kind of relationship with the union? Did the

21     company, I should say?

22  **A.**  **We had a contract with them. That's all.**

23  **Q.**  And if you were to describe your obligations under that

24     contract, in your knowledge what were they?

25  **A.**  **We were to use union employees for brickwork and**

**16**

1     **anything covered by the contract.**

2  **Q.**  What do you mean anything covered by the contract?

3     What did you understand to be covered by the contract?

4  **A.**  **Anything that had to do with masonry.**

5  **Q.**  So beyond brickwork? Other types of masonry work?

6  **A.**  **Correct.**

7  **Q.**  So did you consider yourself a union employer, then?

8  **A.**  **Yes.**

9  **Q.**  At least a union employer as to bricklayers and masonry

10     workers?

11  **A.**  **Correct.**

12  **Q.**  Did you only employ bricklayers who were members of the

13     union?

14  **A.**  **Yes.**

15  **Q.**  And also I guess we'll expand that beyond bricklayers.

16     So other kinds of allied craft workers, if you employed

17     any of those, you only employed union member allied

18     craft workers?

19  **A.**  **No, if it wasn't part of their contract. We did a wide**

20     **variety of different type of work, and there was a**

21     **portion of it that was union work, and the rest of it**

22     **was not, so we used just general, general employees to**

23     **do that work.**

24  **Q.**  Can you give me some examples of what you're thinking

25     of there?

17

1　A.　**As far as the union or nonunion?**

2　Q.　Nonunion.

3　A.　**Caulking sidewalks, parking garages, coatings, below**
4　　　**grade waterproofings.**

5　Q.　And then I understand from just the course of this
6　　　lawsuit that Williams Restoration during the time you
7　　　operated that company did pay into certain union
8　　　benefit funds, correct?

9　A.　**Correct.**

10　Q.　And that would have been only for union member
11　　　employees; is that correct?

12　A.　**Correct.**

13　Q.　Not for any employees who were not union members?

14　A.　**Correct.**

15　Q.　You were not obligated to pay any contributions --

16　A.　**Correct.**

17　Q.　-- for those kinds of employees, correct?

18　A.　**Correct.**

19　Q.　You're doing it again, so just wait for me.  I know my
20　　　questions are long --

21　A.　**Okay.**

22　Q.　-- but I'm going to try to get it all out, so just
23　　　wait.  I'm going to kind of ask you a generalized
24　　　question here.  But just kind of any given time period
25　　　when you were running the company, about how many

18

1　　　employees did you have?

2　A.　**Average, probably around 22.**

3　Q.　And then of the 22, does that include bricklayers,
4　　　people who are out in the field, and then also office
5　　　staff and yourself?

6　A.　**Yes.**

7　Q.　About how many bricklayers would you say in any given
8　　　time period you might typically have employed?

9　A.　**Average, five.**

10　Q.　And then other workers out in the field doing trade
11　　　type work, how many of those types of employees?

12　A.　**Thirteen.**

13　Q.　For employees who you did not pay contributions to the
14　　　union, pension funds or health and welfare funds, did
15　　　you offer benefits to those employees, such as health
16　　　insurance or 401(k)'s or things like that?

17　A.　**401(k).**

18　Q.　Health insurance, no?

19　A.　**No.**

20　Q.　Did you ever have any conversations with anyone from
21　　　the union or representing the union's benefit funds
22　　　about making payments for employees who are not union
23　　　members?

24　A.　**No.**

25　Q.　That issue was never raised with you by anyone as far

19

1　　　as you recall, correct?

2　A.　**No.**

3　Q.　Now, at some point you must have started to think about
4　　　selling the business, right?

5　A.　**Yes.**

6　Q.　So I understand that the asset sale to Fox Holdings
7　　　took place in November 2014, right?

8　A.　**Correct.**

9　Q.　When did you first kind of start thinking about selling
10　　　Williams Restoration?

11　A.　**Probably a year before that.**

12　Q.　And why?

13　A.　**Health reasons.**

14　Q.　Your own health reasons?

15　A.　**Correct.**

16　Q.　And I don't want to get too personal, but was it just
17　　　running the business itself was stressful, that kind of
18　　　thing?

19　A.　**Yes.**

20　Q.　And I know running any business creates a certain
21　　　amount of stress, because it's your business, but can
22　　　you give me a little more detail on what was the stress
23　　　about it?

24　A.　**Just having to be there 24/7.  I mean, it never shut**
25　　　**off.  So I was just getting diagnosed with some health**

20

1　　　**issues, so I needed to destress things.**

2　Q.　Did you have conversations with your employees about
3　　　your thoughts in regard to selling the company?

4　A.　**No.**

5　Q.　At least not prior to when it happened; is that fair?

6　A.　**Correct.**

7　Q.　Did you discuss it with anyone from the union, union
8　　　representatives or their business agent, anything like
9　　　that?

10　A.　**In what period of time?**

11　Q.　Prior to the sale, so prior to November of '14.

12　A.　**I did.**

13　Q.　And with who?

14　A.　**Jared.**

15　Q.　Jared Skaff, right?

16　A.　**Correct.**

17　Q.　Do you remember approximately when that might have
18　　　been?  Are we talking a month before the sale?

19　A.　**A little less than a month, correct.**

20　Q.　Where did that conversation take place, or was it on
21　　　the phone?

22　A.　**Over the phone.**

23　Q.　Did he call you, or you called him?

24　A.　**I called him.**

25　Q.　And what was the reason for calling him?

21

1   **A.**   **To talk about pension liability for me if we sold the**
2      **business.**
3   **Q.**   What was your concern there?
4   **A.**   **Having to pay pension liability.**
5   **Q.**   Like withdrawal liability?
6   **A.**   **Correct.**
7   **Q.**   And so what did you ask Jared about that?
8   **A.**   **I just asked him if we sold the business and I did not**
9      **get back into a business within the five-year window,**
10     **if I would be responsible for pension withdrawal**
11     **liability.**
12   **Q.**   What did he say to you?
13   **A.**   **He didn't think so.**
14   **Q.**   Did he say I need to check on that or we'll get back to
15     you?
16   **A.**   **Correct.**
17   **Q.**   Did he say I'm going to go check on it with a
18     particular person?
19   **A.**   **I think it was Craig Hydeman is who he was going to**
20     **check on it with.**
21   **Q.**   And then did you hear more on that from Craig Hydeman
22     or from anyone else?
23   **A.**   **I never talked to Craig until recently. I didn't**
24     **really have a lot of interaction with him. It was**
25     **mostly Jared that I talked to.**

22

1   **Q.**   So besides Jared telling you I don't think so, I'm
2     going to check on it, did you have any other
3     conversations with anyone from the union or the benefit
4     funds before the sale about the risk of withdrawal
5     liability?
6   **A.**   **No.**
7   **Q.**   Did you engage an attorney on that point?
8   **A.**   **Yes.**
9   **Q.**   Who was that?
10   **A.**   **Dave Buelt.**
11   **Q.**   Did you come to a conclusion one way or the other about
12     whether you were satisfied that you would or would not
13     have this risk of withdrawal liability?
14           MS. OTT: I'm going to start an
15     objection to the extent this might call for
16     attorney-client privilege between Mr. Williams and Mr.
17     Buelt.
18   **Q.**   (BY MS. BORYCA) And I don't need to hear what Mr.
19     Buelt might have communicated to you. Okay? I just
20     want to know what your ultimate conclusion was before
21     the sale.
22   **A.**   **That we would not have any pension withdrawal**
23     **liability.**
24   **Q.**   Besides the phone call with Jared Skaff, did you have
25     conversations with anyone else from the union about the

23

1     sale of the company before the sale took place?
2   **A.**   **No.**
3   **Q.**   Same question with the union benefit fund
4     representatives. Any conversations with anyone from
5     there before the sale?
6   **A.**   **No.**
7   **Q.**   Correct me if I'm wrong, but I believe at some point
8     you became connected with someone at Sunbelt Business
9     Advisors?
10   **A.**   **Yes.**
11   **Q.**   Who was your contact there?
12   **A.**   **Jon Swanson.**
13   **Q.**   And did he assist you in listing your business for
14     sale?
15   **A.**   **Yes.**
16   **Q.**   The sale was November of '14. You said about a year
17     before you started thinking about it. When did you
18     engage Mr. Swanson and Sunbelt? Do you recall,
19     approximately?
20   **A.**   **I would say six months before the sale.**
21   **Q.**   And can you kind of tell me generally what the process
22     was to get the business up for sale?
23   **A.**   **They came in, looked through our books, looked at all**
24     **of our profit-loss statements, tax returns, did an**
25     **inventory of our equipment, and then looked at some job**

24

1     **files and stuff like that just to see what we had for**
2     **jobs and such.**
3   **Q.**   That was by Sunbelt or by people that they had hired to
4     assist?
5   **A.**   **I believe it was through Sunbelt.**
6   **Q.**   Did you have any particular criteria that you were
7     looking for in a buyer besides an agreeable purchase
8     price?
9   **A.**   **No.**
10   **Q.**   And then you kind of told me the reason for wanting to
11     sell the company was health reasons?
12   **A.**   **Correct.**
13   **Q.**   Was this intended to be kind of a retirement from
14     working, or did you know at the time that you put the
15     business up for sale that you might continue to work
16     doing bricklaying?
17   **A.**   **It was more of a retirement thing, but I got bored.**
18   **Q.**   Then at some point I guess in the process with Sunbelt
19     you must have met Jordan Fox, Linda Roberson and Dickie
20     Roberson, right?
21   **A.**   **Yes.**
22   **Q.**   Can you tell me about the first time you met them,
23     where that was and how that went.
24   **A.**   **It was at our office. It was after 5:00. They came**
25     **out, wanted to meet me, kind of take a look at the**

25

1      equipment, talk about what we did for scopes of work
2      and such.
3 **Q.** A Sunbelt person was with you?
4 **A.** Yes.
5 **Q.** Do you remember who that was?
6 **A.** It was Jon Swanson and Andrew Foxhoven, I think is his
7      last name.
8 **Q.** Anything at that meeting about sale price of the
9      business, or was it more just what you've already told
10      me, you talked about the scope of work, some of the
11      equipment?
12 **A.** It was just a meet and greet. There was no talk
13      about -- I mean, they were just coming out to look at
14      the business. So it was just a meet and greet type
15      thing.
16 **Q.** Kind of talk me through what happens next, then, in the
17      sale process.
18 **A.** It was pretty quiet for at least a month or so, two
19      months, maybe. Then Jon had called me and said that
20      they had made an offer and would I accept it.
21 **Q.** Did you accept the offer, or was there a counteroffer?
22      How did that go?
23 **A.** We accepted the offer.
24 **Q.** And then set a date to close the purchase; is that
25      right?

26

1 **A.** They had to set up financing and stuff, so it was kind
2      of a more two or three months down the road before we
3      had an actual closing date.
4 **Q.** So you told me about kind of the very casual meeting
5      the first time you met them after 5:00 p.m. at your
6      office. Did you have other meetings with Jordan, Linda
7      or Dickie before they purchased the business?
8 **A.** I think we had one meeting at Sunbelt's office prior.
9 **Q.** And would this have been before or after they made the
10      offer?
11 **A.** I don't recall that.
12 **Q.** What do you recall being said during that meeting?
13 **A.** It was more just kind of a touch, if they had any other
14      questions for me about the business. That was about
15      it.
16 **Q.** Do you remember if they had any other questions about
17      the business?
18 **A.** I'm certain they did. I don't recall what they were.
19 **Q.** In either of these meetings you mentioned, do you
20      recall the issue of the union or union employees coming
21      up?
22 **A.** I don't recall that.
23 **Q.** How about in your own conversations with Jon Swanson at
24      Sunbelt? Do you remember talking with him about the
25      union at any point prior to the sale?

27

1 **A.** Oh, yes. They knew we were union. We were part union,
2      part not union from the get-go. Like I say, Jon and
3      Andrew Foxhoven worked together on the sale and listing
4      and all that kind of stuff.
5 **Q.** Do you know if they included any references to the
6      union in the description of the business on the
7      website?
8 **A.** I don't believe so.
9 **Q.** How about in any kind of printed materials that they
10      would supply to perspective buyers, do you know if they
11      included anything referencing the union in any of
12      those?
13 **A.** Not that I'm aware of. I've never seen those, so I
14      don't know. They sent me a proof, and it's a very
15      broad, we have this company for sale, it does blah blah
16      blah, for the financials. And that's what most people
17      look for is the financials. But I never saw like a,
18      quote, flyer or anything like that, so I couldn't tell
19      you.
20 **Q.** How do you know that Jon Swanson and Andrew Foxhoven
21      knew that you were union, part union?
22 **A.** I told them.
23 **Q.** Did you tell Jon Swanson in your first meeting with him
24      that?
25 **A.** Yeah.

28

1 **Q.** Tell me what you told him.
2 **A.** I just told him that we're a union contractor but we
3      do -- part of our business is union, and the rest of it
4      is not.
5 **Q.** The part that is union is what part?
6 **A.** The bricklaying, tuck pointing.
7 **Q.** Did Jon or Andrew ever tell you that they had any
8      conversations with Jordan, Linda or Dickie about the
9      union aspect of the business?
10 **A.** I don't believe so until like somewhere in October,
11      after we seen the actual asset agreement and there's a
12      paragraph in there that said something about that we
13      were not a union contractor. I made them change that.
14      Then I know they had a conversation with them about it.
15 **Q.** Prior to the sale would there have been any documents
16      given to either Sunbelt or to Jordan, Linda, Dickie
17      that showed contributions to the pension fund, the
18      welfare fund, the training fund?
19 **A.** No.
20 **Q.** So you told me earlier that you did have a chance to
21      review the affidavit of Linda Roberson, correct?
22 **A.** Correct.
23 **Q.** These are statements that she made under oath. Do you
24      understand that?
25 **A.** Yes.

**29**

1  **Q.** Did you yourself ever give any kind of affidavit to the
2      NLRB?
3  **A.** Yes.
4  **Q.** Something similar to the confidential witness affidavit
5      given by Linda Roberson, correct?
6  **A.** Yes.
7  **Q.** And that's something that you signed as well?
8  **A.** Yes.
9  **Q.** And do you have a copy of that?
10  **A.** No.
11  **Q.** Have you requested a copy of that from the NLRB at any
12      point?
13  **A. I haven't. That really wasn't my fight. So like I**
14      **told my attorney, I said I cannot -- I didn't save it,**
15      **so no, I have never requested a copy.**
16  **Q.** Well, I'm going to ask you some things about what Linda
17      said in hers and then probably what Jordan says, and I
18      want to get your take on whether you agree or disagree
19      so we know what everyone's position is on the facts or
20      their view of the facts. Okay?
21  **A. Okay.**
22  **Q.** So in Linda's, she discussed a meeting at the Sunbelt
23      offices where you were there.
24  **A.** Yes.
25  **Q.** That might be that second meeting you were telling me

**30**

1      about, right?
2  **A. Perhaps.**
3  **Q.** And she says that about that time somebody said to us,
4      and it was probably Jeff, he said there were a couple
5      or three union members at the company. Do you think
6      that you might have said that?
7  **A. I said there was union members at the company, yes, not**
8      **a couple or three, because there's five, five to six of**
9      **us.**
10  **Q.** And were there always five to six throughout let's say
11      the year prior to November 2014?
12  **A. Yeah, up until probably the last month. We had to add**
13      **a couple more guys to the union rolls.**
14  **Q.** So then did it become seven or eight?
15  **A. Probably.**
16  **Q.** And you said you had to add a couple guys to the union
17      rolls. What do you mean by that?
18  **A. Meaning they said that we were doing some of their work**
19      **over in Council Bluffs on a project, so we went ahead**
20      **and signed our guys up.**
21  **Q.** Were these employees that you had that were not union
22      members --
23  **A. Correct.**
24  **Q.** -- and they became union members?
25  **A. Correct.**

**31**

1  **Q.** Because they were working on a job that required union
2      workers?
3  **A. Not necessarily the workers, but the work we were doing**
4      **over there.**
5  **Q.** Fell within what the union felt --
6  **A. Yeah, was under their agreement.**
7  **Q.** So you remember saying at a meeting where Linda was
8      present that there were union members. You just don't
9      remember or don't believe you said it was a couple or
10      three union members?
11  **A. Correct.**
12  **Q.** And so she goes on to say, so I remember it because I
13      said - this is what Linda said - you have two or three
14      members, but you do not have a union contract? Do you
15      recall if she asked you a question like that?
16  **A. I don't recall that.**
17  **Q.** And they, and she has parentheses, Jeff and Andrew
18      said, no, there is no contract. Do you remember saying
19      that at a meeting where Linda was present at Sunbelt
20      offices?
21  **A. I don't recall that.**
22  **Q.** Do you agree with that, no, there is no contract?
23  **A. What was said was I did not have a copy of the executed**
24      **contract. When I signed the contract, the union BA at**
25      **the time, Andy Bomson, took it back to the office and**

**32**

1      **was supposed to send us a copy and never did, so I had**
2      **no contract to show them.**
3  **Q.** So did you tell that to Linda?
4  **A. I believe so.**
5  **Q.** So you think that in a meeting at Sunbelt's offices
6      where Andrew was present, Linda was present and you
7      were there, that you told Linda that you had signed a
8      contract with the union but you didn't have a copy of
9      the signed version?
10  **A. I didn't have an executed copy of it, correct.**
11  **Q.** But you told her that you signed a contract?
12  **A. Yeah. She was aware that we were a union, we had union**
13      **employees, we would have a contract.**
14  **Q.** And she was aware of that because you told her you had
15      signed a union contract?
16  **A. I believe so, yes.**
17  **Q.** And that you had some union member employees?
18  **A. Yeah. They were well aware of that.**
19  **Q.** So if she heard no, there is no contract, that did not
20      come out of your mouth?
21  **A. I don't believe so.**
22  **Q.** She continues and says, as we got closer, an appraisal
23      was ordered. We were about a week and a half or two
24      weeks before we closed. We asked some more questions.
25      She says, I asked again, so you have two or three

33

1      union members, and then she says, and the response was,

2      well, more like five or six. Do you recall saying that

3      in response to Linda's question?

4  **A.**   I don't recall it, but I would think it's probably

5      pretty accurate.

6  **Q.**   Around this time, fall of 2014, you had about five or

7      six union member employees?

8  **A.**   At least, yeah.

9  **Q.**   Had it gone up from --

10  **A.**   Yeah. It had to, because we had to put some more guys

11      on for that job over in Council Bluffs.

12  **Q.**   So it might have been accurate before when she was --

13  **A.**   No, it was not accurate with two or three. Like I say,

14      I'm a union employee, my foreman was a union employee,

15      and I had three bricklayers that were union employees,

16      so there's five total.

17      I would say that we were probably up to six to

18      eight people. We had to sign a couple more guys up for

19      that job in Council Bluffs.

20  **Q.**   She says that she was surprised and she said, but there

21      is no contract and we have an asset purchase, so this

22      is not an issue, correct? Do you remember her asking a

23      question like that?

24  **A.**   I believe so.

25  **Q.**   And do you remember what kind of response you gave to

34

1      her?

2  **A.**   As far as I know -- like I say, I have a contract. I

3      don't know what the purchases are, what the asset

4      purchase and stuff like that. I don't know anything

5      about that stuff. I wasn't told either way.

6  **Q.**   So when she says they said that was correct, that there

7      is no contract and that this is an asset purchase and

8      you are not purchasing any liabilities, you don't think

9      you said anything like that?

10  **A.**   No. I wouldn't have said that, no.

11  **Q.**   Did you hear Jon or Andrew or someone from Sunbelt in a

12      meeting with Linda --

13  **A.**   I don't recall. I don't recall hearing that

14      specifically, no.

15  **Q.**   And if someone had said something like that, that there

16      is no contract, you would have I presume corrected

17      them?

18  **A.**   Correct.

19  **Q.**   So you told me earlier about a change that was made in

20      that asset purchase agreement.

21  **A.**   Yes.

22  **Q.**   Having to do with the union, right?

23  **A.**   Yes.

24  **Q.**   So Linda in her affidavit references a final contract

25      that came back from Jeff's attorney. They put a little

35

1      paragraph in there under organized labor matters. It

2      had not been in the original.

3      She says, this change was made after Jeff had made

4      it known that his dad had a contract years ago and he

5      thought it was still in force with him. Jeff said to

6      me several times not to worry because we have an asset

7      purchase and what his dad did wouldn't affect it. Jeff

8      never told me that he signed a contract. So do you

9      agree or disagree that --

10  **A.**   Disagree.

11  **Q.**   -- you said those kinds of things to Linda?

12  **A.**   Disagree.

13  **Q.**   Did you talk about contracts that your dad may have

14      signed many years ago?

15  **A.**   My father wouldn't have signed a contract. I signed

16      the contracts. I signed all the contracts.

17  **Q.**   So during the course of the company in which your

18      father was involved, he didn't sign any contracts --

19  **A.**   Correct.

20  **Q.**   -- on behalf of the company?

21  **A.**   Correct.

22  **Q.**   Do you think Linda must have just made this up?

23  **A.**   I don't know.

24  **Q.**   Linda describes coming in on the first day after they

25      purchased the company and that you came along with

36

1      them, right?

2  **A.**   Yes.

3  **Q.**   And that you gave a talk to the employees as they were

4      coming in to work, right?

5  **A.**   Yes.

6  **Q.**   She says that she remembers you saying that you

7      appreciated the work, that they had worked so hard, and

8      that the past month was rough. I was just curious if

9      you remember saying that and, if so, why that past

10      month was rough.

11  **A.**   I don't remember saying that. I don't recall that.

12  **Q.**   Was the October of 2014 -- did it have any issues or

13      particular difficulties that stood out?

14  **A.**   Not that I recall.

15  **Q.**   Do you remember any conversations with Jared Skaff

16      following the purchase of the business by Fox Holdings?

17  **A.**   Yes.

18  **Q.**   In person? Telephone conversations?

19  **A.**   We went and had lunch.

20  **Q.**   So the sale was November 7th, 2014? Does that sound

21      about right?

22  **A.**   6th, I believe.

23  **Q.**   6th, that could be?

24  **A.**   Yeah.

25  **Q.**   So when was the lunch?

**41**

1     you disagree that you said that there were two or three
2     employees who were members of the union?
3  **A.**   **Correct.**
4  **Q.**   You agreed with me, I think, that you said at maybe
5     that second meeting that there were five or six
6     employees, right?
7  **A.**   **Correct.**
8  **Q.**   Did you say anything along the lines of it's not a big
9     deal?
10  **A.**   **Yes.**
11  **Q.**   Did you expand on that at all or explain?
12  **A.**   **Yes.**
13  **Q.**   Tell me what you said.
14  **A.**   **I said that we have a nonunion scope of work that we**
15     **work on and we have a union scope of work that we work**
16     **on. They don't intertwine, so it's not a big deal.**
17  **Q.**   Did you have any conversations with Jordan or Linda in
18     these meetings about the scope of work that's union
19     work, you'll be required to pay into union benefit
20     funds?
21  **A.**   **No.**
22  **Q.**   Did you at any point after these initial meetings have
23     that kind of conversation with Jordan or Linda or
24     Dickie?
25  **A.**   **No.**

**42**

1  **Q.**   And do you know if Andrew or Jon or anyone at Sunbelt
2     had that kind of conversation with them?
3  **A.**   **No.**
4  **Q.**   Do you know if that was in any way disclosed to them
5     before the sale of the business?
6  **A.**   **Not to my knowledge.**
7  **Q.**   So do you agree or disagree that you said it was a
8     nonunion company?
9  **A.**   **Disagree.**
10  **Q.**   Because you said it was part union, part nonunion,
11     something like that?
12  **A.**   **Correct. It's an open shop, yes.**
13  **Q.**   Did you use that language? Did you tell them it's an
14     open shop?
15  **A.**   **No.**
16  **Q.**   What you mean by open shop is that you employ union and
17     nonunion employees?
18  **A.**   **Correct.**
19  **Q.**   Did you tell Jordan there is not a contract with the
20     union?
21  **A.**   **No, I did not.**
22  **Q.**   Did you say in these initial meetings that there is a
23     contract with the union?
24  **A.**   **Yes, I did. And the brokers were aware of the contract**
25     **also.**

**43**

1  **Q.**   Other than you saying that there was a contract, did
2     you make them aware in any other way?
3  **A.**   **Example? I don't know.**
4  **Q.**   Well, I think you said that you didn't have a copy of
5     the signed contract?
6  **A.**   **Correct.**
7  **Q.**   Did you try to get a copy of that?
8  **A.**   **No. The brokers -- we contacted Jared, and Jared**
9     **actually emailed it over to the brokers.**
10     (Exhibits 12 and 13 marked for identification)
11  **Q.**   Mr. Williams, I've handed you what we've marked as
12     Exhibits 12 and 13. I'll direct your attention to 12
13     first, please, and this is a document that I recently
14     received from your attorneys. Is this something that
15     you've seen recently as well?
16  **A.**   **Yeah.**
17  **Q.**   You provided this to them, I take it?
18  **A.**   **Correct.**
19  **Q.**   And so we were just talking about that I think you said
20     you asked Jared, maybe, to send a copy of the contract?
21  **A.**   **I believe so, yes.**
22  **Q.**   And then you said he emailed it to the brokers?
23  **A.**   **I believe so, yes.**
24  **Q.**   Is that what this email shows, if you kind of start
25     backwards?

**44**

1  **A.**   **Yes.**
2  **Q.**   If we look at the page that's the third page at the
3     bottom, it's marked Williams 14879, it looks to be an
4     email from Nancy to you, correct?
5  **A.**   **Okay. Yes.**
6  **Q.**   Is that an email that you received?
7  **A.**   **Yes.**
8  **Q.**   And then Nancy says, here is a copy of the contract,
9     right?
10  **A.**   **Correct.**
11  **Q.**   And that must have had an attachment with it?
12  **A.**   **Correct.**
13  **Q.**   And I understand I think that maybe you weren't able to
14     recover the attachment or that part didn't save for
15     you?
16  **A.**   **This was on my old email, so I had no way to get any of**
17     **this stuff.**
18  **Q.**   If you go to the next page, 14880 at the bottom, at the
19     very bottom, right there, it looks like that's an email
20     from you to Andrew Foxhoven. Is that what that is?
21  **A.**   **Correct.**
22  **Q.**   And so you forwarded the email you had received from
23     Nancy to Andrew?
24  **A.**   **Correct.**
25  **Q.**   And then if we move up in the middle of this page, this

45

1    appears to be an email from Andrew Foxhoven to Charles
2    Sederstrom, Jordan Fox and then another third email
3    address, right?
4  **A.**  Correct.
5  **Q.**  And then if we go to the first page, at the very top,
6    this appears to be another -- well, why don't you tell
7    me. Is this an email that you received? The email
8    address in the to line is summitbuilding@cox.net.
9  **A.**  Yes.
10  **Q.**  That's an email that you use, I take it?
11  **A.**  Yes.
12  **Q.**  Because Summit Building is another business that you
13    own, right?
14  **A.**  It's my real estate, yeah.
15  **Q.**  So you received that email on April 8, 2016; is that
16    right?
17  **A.**  Correct.
18  **Q.**  From Jon Swanson at Sunbelt?
19  **A.**  Uh-huh.
20  **Q.**  Right? Correct?
21  **A.**  Correct.
22  **Q.**  Did that email that you received contain all of the
23    emails before it on pages two and three?
24  **A.**  Yeah. I printed whatever it would print.
25  **Q.**  And do you know why Jon Swanson was emailing this to

46

1    you?
2  **A.**  Because of the questions about having a contract or not
3    having a contract.
4  **Q.**  Because of questions that you had, questions that other
5    people had? What questions?
6  **A.**  That Fox had had about -- there was some discussion
7    about the whole contract, you know, if we had a
8    contract, when we had our contract, so I had him just
9    send me this so I had proof that they were aware that
10    we had a contract.
11  **Q.**  And had this come up in some conversations with the Fox
12    Holdings people around this time in April 2016?
13  **A.**  I believe that's when they were trying to -- they
14    stopped paying the benefits in. They were going to
15    stop paying the benefits in on the contract, or on the
16    health and welfare. I'm sorry. Let me rephrase that.
17    That would have been probably when this lawsuit
18    started originally, yeah. I don't think that that had
19    anything to do with them not paying the benefits, now
20    that I look at the date, '16.
21  **Q.**  Let me make sure I understand. So you think you were
22    asking about this because the lawsuit that we're here
23    for today was kind of in the early stages?
24  **A.**  Yes. Yeah.
25  **Q.**  Had you received questions from Fox Holdings on this

47

1    topic?
2  **A.**  No. At that time Fox Holdings wasn't involved, and it
3    was me against the union.
4  **Q.**  So why early on in the lawsuit were you wanting to
5    obtain this information from Sunbelt?
6  **A.**  Just in case they needed it.
7  **Q.**  In case the unions needed it?
8  **A.**  In case I needed it, for protection, like I say, for
9    proof that they were aware of it.
10  **Q.**  That Fox Holdings was aware?
11  **A.**  Yes.
12  **Q.**  Did you have some kind of fear at this point that Fox
13    Holdings was going to make a claim against you?
14  **A.**  No.
15  **Q.**  Proof to offer to the unions?
16  **A.**  Correct.
17  **Q.**  Now let's move to Exhibit No. 13. So this is a
18    document that after we received Exhibit 12 from you, I
19    went back and checked with the Fox Holdings people to
20    see what we had in regard to some of the emails in
21    Exhibit 12.
22    And correct me if I'm wrong, but on the first
23    page that's Fox 228, does that appear to be the same
24    email as Andrew Foxhoven's email that's on page two of
25    Exhibit 12?

48

1  **A.**  Yes.
2  **Q.**  Dated October 22nd, 2014, right?
3  **A.**  Yes.
4  **Q.**  I was able to recover the attachment, and so if you
5    could take a look at what starts on page Fox 230.
6  **A.**  Uh-huh.
7  **Q.**  And take your time looking at that, but I'd like to
8    know, is this the attachment that was on the email that
9    you received from Nancy at the Bricklayers Union, which
10    is the third page of Exhibit 12? Do you recall?
11  **A.**  I don't recall. I'm guessing yes, but I think that's
12    what -- they said that they sent just a copy of the
13    contract, but I don't think that I ever opened the
14    attachment. I think I just forwarded it on to Andrew.
15  **Q.**  Have you seen this document before that's this
16    attachment starting at page Fox 230?
17  **A.**  This specific one?
18  **Q.**  Yes.
19  **A.**  No.
20  **Q.**  Do you have any reason to disagree that this is what
21    was set forth in the attachment from the email from
22    Nancy to you on October 21st, 2014?
23  **A.**  No.
24  **Q.**  Do you know if anyone provided to Fox Holdings any kind
25    of agreement like this, what's set forth on page Fox

**49**

1 　230 through Fox 246 in which there was an employer name

2 　included on the first two blanks on the first page of

3 　the agreement?

4 **A.** **Not that I'm aware of.**

5 **Q.** How about any kind of agreement like this where the

6 　final page, the last page, is Fox 246, where there

7 　was --

8 **A.** **Not that I'm aware of.**

9 **Q.** Do you know if anyone provided this agreement that

10 　included any kind of information filled in the blanks

11 　on page Fox 246?

12 **A.** **Not that I'm aware of.**

13 **Q.** Any kind of agreement like this that was signed by

14 　anyone?

15 **A.** **Not that I'm aware of.  Not that I've ever seen.**

16 **Q.** And so ultimately the sale went through, right?

17 **A.** **Yes.**

18 **Q.** And that was pursuant to an asset purchase agreement?

19 **A.** **Correct.**

20 **Q.** Let's look at that.

21 　　　　　(Exhibit 14 marked for identification)

22 　　　　　(Recess taken at 11:07 a.m., and

23 　　　　　deposition resumed at 11:13 a.m.)

24 **Q.** Back on record here.  We've handed you what we've

25 　marked as Exhibit No. 14, and you recognize that,

**50**

1 　correct?

2 **A.** **Correct.**

3 **Q.** That's the asset purchase agreement between you and Fox

4 　Holdings; is that right?

5 **A.** **Correct.**

6 **Q.** And that shows that the effective date of the sale was

7 　November 6, 2014, correct?

8 **A.** **Correct.**

9 **Q.** And so we talked a little bit earlier about a term that

10 　you had asked to be added in or revised regarding the

11 　union?

12 **A.** **Correct.**

13 **Q.** Is that what's in 3.10?

14 **A.** **Correct.**

15 **Q.** And that's called organized labor matters, right?

16 **A.** **Correct.**

17 **Q.** And tell me again what it was that spurred you wanting

18 　this language to be included in the agreement.

19 **A.** **The language prior to that said that we were not**

20 　**involved with any type of labor union, which would have**

21 　**been false, so we had them change it to this.  I don't**

22 　**know if this had what they had.  I don't know who**

23 　**worded this specifically, but . . .**

24 **Q.** You said you had them or they changed it.  Do you just

25 　mean your attorney or someone else?

**51**

1 **A.** **Andrew.**

2 **Q.** Andrew Foxhoven at Sunbelt?

3 **A.** **Yes.**

4 **Q.** So is he the person who prepared this language in 3.10?

5 　Do you know?

6 **A.** **I can't answer that for sure.  I don't know for sure.**

7 　**I don't recall, I should say.**

8 **Q.** So if we look closely here at the language that you

9 　agreed to, it says seller employs and has employed

10 　union employees, specifically Bricklayers Union

11 　members.  And you agree with all of that, correct?

12 **A.** **Correct.**

13 **Q.** And has been party to the overall union contract.  Did

14 　I read that correctly?

15 **A.** **Correct.**

16 **Q.** Help me understand what you intended to mean by overall

17 　union contract.

18 **A.** **That we had a union contract.**

19 **Q.** That there was a union contract; is that fair?

20 **A.** **Yes.**

21 **Q.** That's what you meant by that?

22 **A.** **Yes.**

23 **Q.** I just wanted to know mainly about the overall

24 　language.

25 **A.** **I don't know.  I didn't put that in there.  I didn't**

**52**

1 　**write it, so . . .**

2 **Q.** And you don't really have an understanding what is

3 　meant by that part of it?

4 **A.** **Correct.**

5 **Q.** And that same language there it says, and has been

6 　party to.  I guess that's correct in your view?

7 **A.** **I don't know.  Like I say, when it comes to legal**

8 　**language, I don't understand that.  I don't understand**

9 　**how -- I guess I don't understand it.  That's why I**

10 　**talked to my lawyer and have them explain it to me in**

11 　**laymen's terms.**

12 **Q.** Fair enough.  I mean, you'd agree this doesn't say

13 　anywhere is a party to a union contract?  Does not say

14 　that, right?

15 **A.** **Not that I read.**

16 **Q.** Go back for just a moment.  I think we're done with

17 　that one.  If you wouldn't mind, just go back to 13 and

18 　12.

19 **A.** **Okay.**

20 **Q.** In 12, we talked earlier, the second page shows you

21 　forwarding the email from Nancy with a contract to

22 　Andrew Foxhoven.

23 　　　　　Did you have any kind of follow-up conversations

24 　with Andrew Foxhoven about what you had emailed and

25 　sent, a phone call or anything in person?

53

1    A.    Not that I'm aware of.

2    Q.    Did he ever ask you any questions about what you had

3        forwarded from Nancy?

4    A.    No.

5    Q.    And any conversations along those same lines with Jon

6        prior to the sale at Sunbelt?

7    A.    No. Andrew pretty much did all the paperwork, you

8        know, went through and was getting everything lined up.

9        Jon was just kind of his assistant through that

10        process.

11    Q.    We're kind of changing gears here little bit. So I

12        understand after the asset sale that you kind of stayed

13        on with Fox Holdings pursuant to like a transition

14        agreement, right?

15    A.    Yes.

16    Q.    Not paid for that?

17    A.    No.

18    Q.    In like a consulting role; is that fair?

19    A.    Yes.

20    Q.    About how long did that last?

21    A.    Thirty days.

22    Q.    Can you kind of give me just a general description of

23        what all you did during those 30 days?

24    A.    Not much.

25    Q.    Were you at Williams Restoration on a daily basis,

54

1        would you say?

2    A.    Yes.

3    Q.    At the office?

4    A.    Yes.

5    Q.    Spending time with Jordan and Linda?

6    A.    Yes.

7    Q.    What sort of things did you have to show them, teach

8        them, walk them through?

9    A.    The 30 days I was there, they spent more time setting

10        up credit accounts and stuff like that, so I didn't do

11        much. If they had a question about something or

12        equipment or whatever, I would answer it, show them how

13        to run it. That was about it.

14        It was very cold out, so we couldn't really go out

15        and look at any jobs, because we didn't have any jobs

16        going on at that time. It went from 50 degrees the

17        week before to 10 below that following week.

18        But they had been out on jobs with me before we'd

19        actually closed. They went out and visited a couple

20        jobs and stuff like that with me.

21    Q.    And during the course of those visits, was that to

22        confer with employees that were working there or with

23        the job owners or project managers?

24    A.    Just to see scopes of work of what we did.

25    Q.    So during this 30-day transition period did you have

55

1        any kinds of conversations with your now former

2        employees, I guess, about the union?

3    A.    No. No. When Linda and Jordan and Dickie and I

4        talked, we were going to run things status quo. They

5        were just going to leave things alone and run it the

6        way it was.

7        And I told them at that time, I said I had been a

8        union contractor for 18 years, I had made money, this

9        is, you know, my profits, my margins, this is what I've

10        done.

11        So at that time I thought they were just going to

12        continue with the union. Then later they realized that

13        it was quite a bit more expensive to pay the benefits

14        and stuff like that, so they opted out of it.

15    Q.    Conversations with Doug Tiefenthaler about to whether

16        Fox Holdings was going to --

17    A.    No. No.

18    Q.    None?

19    A.    No. You don't discuss things with him, because then

20        everybody has that knowledge.

21    Q.    How about with Tom Burford, Sr. or Tom Burford, Jr.?

22    A.    No. My dealings after we closed were on a friendly

23        level, personal level, with the employees, nothing to

24        do with the business, because I'm not their boss.

25        That's not my call to make what they can do or

56

1        what Williams Restoration would do from then on.

2        That's not my call.

3    Q.    Did you hear about any rumblings among employees about

4        whether a union contract would be entered into or not?

5    A.    I did not.

6    Q.    I think you already told me that you didn't have any

7        conversations with Jared Skaff after the sale about

8        that; is that correct?

9    A.    Correct.

10    Q.    And none with Craig Hydeman?

11    A.    No. I've talked to Craig Hydeman twice in my life,

12        once here recently to find out about my benefits, and

13        then once, I believe it was prior to the sale, because

14        they were not providing training and stuff like that

15        for my union employees up here. Those are the only two

16        times that I recall talking to him.

17    Q.    So the earliest conversation with Craig Hydeman you

18        said was about training you were looking for for your

19        employees --

20    A.    Yes.

21    Q.    -- but felt they weren't getting, correct?

22    A.    Correct, they were not, yes.

23    Q.    And so I imagine this was in 2014 at some time?

24    A.    Yeah.

25    Q.    Because I understand that the Local 1 merged at the

57

1      beginning of 2014 with the Local 15, right?
2  A.  Correct.
3  Q.  And then the second conversation, can you approximate
4      for me when that was?
5  A.  September of this year.
6  Q.  And did you call him, or did he call you?
7  A.  I called him.
8  Q.  And tell me again what the purpose of the call was.
9  A.  I was looking to speak to their benefit people to find
10      out how many more hours I needed to get my benefits for
11      our pension.
12  Q.  Did you speak with Craig Hydeman about anything else
13      other than that?
14  A.  No.
15  Q.  Was he able to provide the answer to you, or did you
16      get referred to someone else?
17  A.  Yes.
18  Q.  Yes, he provided the answer?
19  A.  Yeah. Somewhat, yeah.
20  Q.  I'll make an assumption here. Did you need more hours?
21  A.  Yeah. Yes, I do.
22  Q.  Is that part of the reason, then, that you went back to
23      work for McGill?
24  A.  Yeah. Yeah.
25  Q.  Have you had conversations with any other

58

1      representatives of the pension fund or the health and
2      welfare fund or the apprenticeship in training fund
3      since the sale to Fox Holdings?
4  A.  No.
5  Q.  How about with any like a business agent of the union?
6  A.  No.
7  Q.  Anyone in a leadership capacity in the union regarding
8      Fox Holdings?
9  A.  No.
10  Q.  Just anyone in general in the union about Fox Holdings?
11  A.  No.
12  Q.  At some point I think you had some kind of back and
13      forth with Jordan on like a job reconciliation?
14  A.  Yes.
15  Q.  Can you tell me approximately when that happened?
16  A.  Prior to probably -- it was prior to November '16,
17      probably a month or so prior to that.
18  Q.  Prior to November of 2016?
19  A.  Correct.
20  Q.  So in the fall of 2016, generally?
21  A.  Yes.
22  Q.  And then can you just kind of describe for me what the
23      conversation was there and then kind of ultimately what
24      happened after discussing the job reconciliation?
25  A.  They felt that we weren't as far along on some of the

59

1      jobs that we had billed for, so they thought that we
2      overbilled some.
3          So we talked about it. We went down and talked
4      about it, and we came back up with an agreement on a
5      price, and we signed a -- I don't have that document,
6      but we signed an agreement that this is what we'd
7      settle for.
8  Q.  And so just to kind of make sure I understand, Jordan,
9      Fox Holdings, thought that maybe you had overestimated
10      or overvalued the amount of time put into jobs prior to
11      the sale and that they had to end up doing more work;
12      is that fair?
13  A.  Yes.
14  Q.  So you kind of trued-up that through another agreement,
15      right?
16  A.  Yes.
17  Q.  And then at some point I understand that you considered
18      or at least your attorney communicated on your behalf
19      that you wanted to dissolve Williams Restoration
20      Company. Is that right?
21  A.  Yes.
22  Q.  Was that early 2016? Do you remember?
23  A.  Probably, yes.
24  Q.  What was the reasoning behind that?
25  A.  I don't need another corporation. It doesn't serve any

60

1      purpose.
2  Q.  Did it end up dissolving?
3  A.  No.
4  Q.  Why not?
5  A.  Because of the lawsuits.
6  Q.  And you mentioned lawsuits. We've got the one lawsuit
7      that we're here for today that's been brought by the
8      union benefit funds?
9  A.  Yes.
10  Q.  Are there other lawsuits against Williams Restoration?
11  A.  Just against the benefits, yeah, for the audit.
12  Q.  Just the one lawsuit, then?
13  A.  Yes.
14  Q.  I apologize if I've asked you this. Are there any
15      other shareholders of Williams Restoration Company,
16      Inc. than you?
17  A.  No.
18  Q.  And does it own any other companies? Does it own any
19      LLCs, anything like that?
20  A.  No.
21  Q.  And does it own any noncash assets, property, personal
22      property?
23  A.  No.
24  Q.  Does it still have some cash?
25  A.  Yes.

1 **Q.** Has it done any business since the asset purchase by
2   Fox Holdings?
3 **A.** **No.**
4 **Q.** So fair to say it hasn't earned any income since that
5   point besides perhaps interest?
6 **A.** **Yes.**
7 **Q.** And we talked earlier about that you remember giving an
8   affidavit in the NLRB case, right?
9 **A.** **Yes.**
10 **Q.** And that was a case that was brought against Fox
11   Holdings, correct?
12 **A.** **I believe so.**
13 **Q.** Other than giving the affidavit, which -- did that
14   follow an interview like with an NLRB investigator?
15 **A.** **Yes.**
16 **Q.** And then they prepare it for you and send it to you to
17   review; is that right?
18 **A.** **Yes.**
19 **Q.** Other than that, the interview and then reviewing the
20   affidavit and signing it, did you submit anything else
21   to the NLRB in those proceedings against Fox Holdings?
22 **A.** **I don't believe so.**
23 **Q.** Did you just have one conversation with the NLRB
24   investigator?
25 **A.** **Yes.**

1 **Q.** Did you talk about the NLRB proceedings with anyone at
2   Fox Holdings?
3 **A.** **No.**
4 **Q.** Jordan or Linda or Dickie, did they ever call you and
5   say we're in the middle of these NLRB proceedings and
6   have any questions, anything like that?
7 **A.** **They did make me aware that they were dealing with**
8   **that, but no, no questions.**
9 **Q.** Was that a phone call?
10 **A.** **I don't remember if it was a phone call or if I stopped**
11   **by the office.**
12 **Q.** So following that 30-day transition period, did you
13   have occasions or reasons to visit the office on a
14   regular basis?
15 **A.** **No. Just stop by once in awhile just to see how things**
16   **were going. I didn't feel that 30 days is really a**
17   **good period of time, especially given the weather and**
18   **such. I stopped by just to make sure things were going**
19   **well and if they had any questions or if they needed**
20   **help going to look at a job or whatever, just to kind**
21   **of offer my expertise.**
22 **Q.** Can you estimate like how many times you think you did
23   that?
24 **A.** **A couple dozen.**
25 **Q.** A couple dozen?

1 **A.** **Yeah.**
2 **Q.** So during one of those times or perhaps a phone call,
3   you think you heard from Jordan or Linda that we've got
4   this NLRB thing going on?
5 **A.** **Yes.**
6 **Q.** Did they have any questions for you about it?
7 **A.** **Not that I remember.**
8 **Q.** Did they share any details of what the --
9 **A.** **Not that I recall.**
10 **Q.** Other than the fact that it was happening, did you have
11   any conversations on any other details of the NLRB case
12   with them?
13 **A.** **Not that I recall.**
14 **Q.** How about with anyone else, anyone at the union, any
15   discussions about the NLRB?
16 **A.** **No.**
17 **Q.** So did any representative from the union ever ask you
18   any questions about Fox Holdings with regard to unfair
19   labor practices?
20 **A.** **Nope.**
21 **Q.** Do you remember whether the NLRB emailed you your
22   affidavit, or did it come by mail?
23 **A.** **I believe it was emailed.**
24 **Q.** Have you gone back to look and see if you have that?
25 **A.** **I have.**

1 **Q.** Haven't been able to find that?
2 **A.** **I have not.**
3      (Off-the-record discussion)
4    (Exhibits 15 and 16 marked for identification)
5 **Q.** I'm going to hand you now what is marked as Exhibit 15
6   and 16. Those are documents that were in the
7   possession of Fox Holdings.
8    I don't want to spend a lot of time on this, but I
9   do just want to verify what these are. Do you know
10   what these are?
11 **A.** **Bank statements.**
12 **Q.** And these are for accounts that, correct me if I'm
13   wrong, but from the first page are Williams Restoration
14   Company, Inc. accounts?
15 **A.** **Correct.**
16 **Q.** And the first page of Exhibit 15 shows a business free
17   checking and a business 300 class savings, correct?
18 **A.** **Correct.**
19 **Q.** Are those both accounts that were held by Williams
20   Restoration Company, Inc.?
21 **A.** **Correct.**
22 **Q.** Do you know if these statements were among the records
23   of Williams Restoration Company that were transferred
24   to Fox Holdings through the asset sale?
25 **A.** **I don't understand the question.**

65

1  Q.  Were these records among the business records of
2      Williams Restoration Company that were sold to Fox
3      Holdings?  Do you know?
4  A.  These records, you mean --
5  Q.  These documents right here.
6  A.  I don't think so, no.  These would have been ours.  You
7      got these from Fox Holdings?
8  Q.  Right.  Right.
9  A.  Yeah, they should have been out with our files.
10 Q.  Are you able to tell from looking at Exhibit 15, can
11     you tell the dates of these statements for these
12     accounts?  I see transactions for December.  I just
13     want to verify on the record, if you can, the period
14     for these statements.
15 A.  Okay.  Yes.  December.
16 Q.  2014?
17 A.  Yeah.
18 Q.  And then it goes into -- if you're at page 284, it goes
19     into January 1st, 2015, correct?
20 A.  Correct.
21 Q.  And then if you go to 293, it's February 1st through
22     February 28th, 2015, correct?
23 A.  Correct.
24 Q.  And then if you look at Exhibit 16, the first page
25     shows those same accounts, right, the business free

66

1      checking and business 300 class savings?
2  A.  Yes.
3  Q.  And this is for March 1st, 2015, through March 31st,
4      2015, correct?
5  A.  Correct.
6  Q.  And then looking at page 305, April 1st, 2015, through
7      April 30th, 2015, correct?
8  A.  Correct.
9  Q.  And then Fox 312 is July 1st, 2015, through July 31st,
10     2015, correct?
11 A.  Correct.
12 Q.  And if we get to that one, it looks to me that that
13     only shows the business free checking account.  Is that
14     what you see as well?
15 A.  Yes.
16 Q.  Had the business 300 class savings account been closed,
17     then, by July 1st, 2015?
18 A.  Yes.
19 Q.  Was that money moved to a different account, or was
20     that just a distribution made?
21 A.  Distribution.
22     (Exhibit 9 marked for identification)
23 Q.  Mr. Williams, I'm going to hand you what was previously
24     marked as Exhibit No. 9 during Mr. Hydeman's
25     deposition, and we've put a new exhibit sticker on it

67

1      showing it's Exhibit 9 for today as well.  Have you
2      seen that document before?
3  A.  Yes.
4  Q.  And what is this?
5  A.  I don't know.  I just saw it this morning.
6  Q.  Well, do you remember when we started I asked if you
7      had reviewed any documents in preparation for today.
8      Is this another one that you reviewed in preparation
9      for today?
10 A.  I just saw it, yeah.
11 Q.  Were there other documents that you were looking at?
12 A.  No.  Just the depositions from the NLRB.
13 Q.  The affidavits?
14 A.  Affidavits. I'm sorry.
15 Q.  Have you seen this before today?
16 A.  I think I have, yes.
17 Q.  If we look at the second page of it that's page 109 at
18     the bottom, there's a carbon copy with your name and an
19     address.  Is that your home address?
20 A.  Yes.
21 Q.  Did you receive this by certified mail at your home
22     address?
23 A.  I think so, yes.
24 Q.  And the date that it was sent at the top of the first
25     page is May 4th, 2015?

68

1  A.  Yes.
2  Q.  Do you think you received it a few days after that?
3  A.  Yes.
4  Q.  Did you do anything in response to this letter?
5  A.  I don't recall.  I think I made a phone call to him and
6      talked to them, but I don't remember what we did after
7      that, to be honest.
8          I know they did come down.  Deboer came down and I
9      think got most of our files, picked up all our files,
10     and did the audit.
11         But I don't recall when that was.  I know it was
12     late in the fall of I believe it was '15 that they did
13     that is when the audit came due, or came through.  I
14     don't know if that was part of this.  I don't recall on
15     this specifically.
16 Q.  You said someone came and picked up your records.  Who
17     did you say?
18 A.  I believe it was one of the accountants from Deboer.
19 Q.  Deboer?
20 A.  Yeah.  They went down to the office and picked them up.
21     I didn't have these documents in my possession at that
22     time.
23 Q.  They went to the Williams Restoration office that was
24     now run by Fox Holdings by this time, correct?
25 A.  Yes, correct.

77

1  **A.**  **Yes.**
2  **Q.**  So Fox Holdings doing business as Williams Restoration
3       currently pays J & L Partnership, LLC rent; is that
4       correct?
5  **A.**  **Yes.**
6  **Q.**  And that's at the 725 North Frontier Road address?
7  **A.**  **That's the building we own, yes.**
8  **Q.**  And that's in Papillion --
9  **A.**  **Yes.**
10 **Q.**  -- Nebraska?
11 **A.**  **You didn't butcher that.**
12 **Q.**  And how long have you owned that building?
13 **A.**  **Since 2001.**
14 **Q.**  And do you own that solely yourself now?
15 **A.**  **No.**
16 **Q.**  You own that with your father?
17 **A.**  **Correct.**
18 **Q.**  Going back to Exhibit 5, that's the collective
19       bargaining agreement that Ms. Boryca questioned you
20       about.  Would you flip to page 18.
21          At the bottom there's a BAC funds, and it's
22       numbered one on the first page, and then the last page
23       of that document, I believe there's a page 18.
24 **A.**  **I'm sorry.  What was the page?**
25 **Q.**  Page 18.

78

1  **A.**  **Okay.**
2  **Q.**  And that's titled amendment number one to collective
3       bargaining agreement?
4  **A.**  **Yes.**
5  **Q.**  Do you recognize this document?
6  **A.**  **Yes.**
7  **Q.**  Is that your signature on the bottom?
8  **A.**  **Yes.**
9  **Q.**  Could you tell me about what this document is, if you
10      can recall.
11 **A.**  **I believe this was to start paying our funds to Local**
12      **15.**
13 **Q.**  And do you know when you signed it?
14 **A.**  **I do not.**
15 **Q.**  Do you recall the circumstances as to why you signed
16      it?
17 **A.**  **Because we had been absorbed by Local 15.**
18 **Q.**  And then after you signed this amendment, you started
19      making contributions to the Local 15 funds instead of
20      the Local 1 funds; is that correct?
21 **A.**  **Correct.**
22 **Q.**  Do you know who brought this amendment to you?
23 **A.**  **I do not.**
24 **Q.**  Did you hear anything else other than the amendment
25      concerning the merger of Local 1 and Local 15?

79

1  **A.**  **I did not.**
2  **Q.**  Prior to the merger were you a participant in the OCI
3       Welfare Fund?
4  **A.**  **Yes.**
5  **Q.**  So you had health insurance through the OCI Welfare
6       Fund?
7  **A.**  **Yes.**
8  **Q.**  And after the merger were you a participant in the BAC
9       Local 15 Welfare Fund?
10 **A.**  **Yes.**
11 **Q.**  And are you currently a participant in the Local 15
12      Welfare Fund?
13 **A.**  **I'm not vested.  I don't have enough hours to be.**
14 **Q.**  Do you know when your eligibility with the welfare fund
15      ended?
16 **A.**  **I do not.  I think it's nine months.**
17 **Q.**  Was it nine months after the sale of --
18 **A.**  **I believe so.**
19 **Q.**  Because after the sale of the business to Fox Holdings,
20      you were no longer employed as a bricklayer; is that
21      correct?
22 **A.**  **Correct.**
23 **Q.**  I'm going to hand you a document.  I think we're on 17.
24          (Exhibit 17 marked for identification)
25 **Q.**  I would just like to go over some of the type of work

80

1       that Williams Restoration performed while you were
2       still owner and owner of Williams Restoration.  Did
3       Williams when you owned it perform commercial below
4       grade waterproofing?
5  **A.**  **Yes.**
6  **Q.**  Did Williams when you owned it perform joint ceiling
7       and caulking?
8  **A.**  **Yes.**
9  **Q.**  Did Williams when you owned it perform tuck pointing,
10      brick and block repair, masonry restoration and
11      cleaning and masonry sealers?
12 **A.**  **Yes.**
13 **Q.**  Did Williams during your ownership of the company
14      perform limestone patching?
15 **A.**  **Yes.**
16 **Q.**  Did Williams when you owned it perform deck coating,
17      traffic toppings, floor coatings on parking garages,
18      balconies and industrial floors?
19 **A.**  **Yes.**
20 **Q.**  Did Williams during the time you owned it do commercial
21      expansion joint installation?
22 **A.**  **Yes.**
23 **Q.**  Did Williams during your ownership of the company
24      perform concrete repair and patching?
25 **A.**  **Yes.**

81

1    **Q.**   Did Williams during your ownership of the company

2        perform structural grouting?

3    **A.**   Yes.

4    **Q.**   And did Williams during your ownership perform chemical

5        grouting?

6    **A.**   Yes.

7    **Q.**   And epoxy injection?

8    **A.**   Yes.

9    **Q.**   Are there any other types of work that Williams

10       performed that aren't on this?

11   **A.**   We did roofing.

12   **Q.**   Roofing?

13   **A.**   Commercial roofing also.

14   **Q.**   How much was roofing a percentage of your revenue or

15       business?

16   **A.**   Two percent.

17   **Q.**   So fairly minimal?

18   **A.**   Very minimal, yes.

19   **Q.**   You can set that aside, if you want. I want to go back

20       to some of your testimony regarding the sale of your

21       business. So you solicited Sunbelt to perform the sale

22       of Williams Restoration?

23   **A.**   Correct.

24   **Q.**   Did you speak to any other brokers regarding selling

25       Williams Restoration?

82

1    **A.**   No.

2    **Q.**   What was the process when you initially contacted

3        Sunbelt? Did you have to provide them with

4        documentation concerning your books, or could you just

5        explain the process to me of how you went about selling

6        your business?

7    **A.**   They actually put a card on our door and said they had

8        somebody interested in our type of business, so I

9        contacted them, because I had been kind of

10       contemplating how to go forward.

11         So I contacted them. They walked me through the

12       process. We signed a nondisclosure. They needed to

13       look at my tax returns and my profit and loss statement

14       for the last three years.

15   **Q.**   So they solicited you first regarding the sale?

16   **A.**   Correct.

17   **Q.**   Did the company give you any information on who was

18       interested in purchasing your company?

19   **A.**   No.

20   **Q.**   Did it ever later come out that the Robersons were

21       interested in purchasing the company, meaning was their

22       interest what drove Sunbelt to contact you in the first

23       place?

24   **A.**   No.

25   **Q.**   No?

83

1    **A.**   No.

2    **Q.**   Do you know what the reason was that Sunbelt initially

3        contacted you?

4    **A.**   They had somebody looking. I think that's more of a

5        sales ploy for them. But I'm not sure. They said

6        they had somebody looking for my type of business,

7        which I don't think they really understood my type

8        of business.

9    **Q.**   So you testified earlier that you had an initial

10       meeting with the Robersons regarding sale. Do you

11       know, did the Robersons give you any information on why

12       they were interested in purchasing Williams

13       Restoration?

14   **A.**   They were interested in buying a business.

15   **Q.**   Do you know what purpose they were buying the business

16       for?

17   **A.**   I don't. I assume probably to own a business.

18   **Q.**   Did they provide you with any information that they

19       wanted to purchase it for their son, Jordan Fox?

20   **A.**   They had mentioned that, yeah.

21   **Q.**   And what was the mention of that?

22   **A.**   Just stating that they wanted to own a business and

23       they were buying it with him to set him up in the

24       business.

25   **Q.**   And do you know if Dickie Roberson or Linda Roberson

84

1        had any experience in the construction industry?

2    **A.**   I believe Linda's ex-husband was a cabinetmaker.

3    **Q.**   Do you know if Jordan Fox had any experience in the

4        construction industry?

5    **A.**   Not that I'm aware of.

6    **Q.**   Do you know what his background was?

7    **A.**   He was an IT guy.

8    **Q.**   Did you ever view any information that Sunbelt was

9        putting out to potential buyers regarding your

10       business?

11   **A.**   I don't think so.

12   **Q.**   So you don't know whether or not Sunbelt itself

13       disclosed to potential buyers that Williams Restoration

14       was signatory to a Local 15 or generally a union

15       contract?

16   **A.**   I don't believe so. I don't know for sure.

17   **Q.**   You don't know for sure?

18   **A.**   Yeah.

19   **Q.**   When you had the initial meeting with the Robersons,

20       did you bring up that you were a union signatory

21       company?

22   **A.**   No.

23   **Q.**   Did you disclose to Sunbelt initially that you were a

24       union signatory company?

25   **A.**   Yes.

85

1  Q.  And did you provide them documentation of your
2      signatory status initially?
3  A.  No.
4  Q.  Did they ask?
5  A.  No.
6  Q.  In your conversations with the Robersons or Jordan Fox,
7      did you ever mention that you yourself were a Local 15
8      member?
9  A.  Yes.
10 Q.  When was that?
11 A.  I don't recall exactly when.
12 Q.  Do you think it was pretty early on in the process?
13 A.  Probably later in the process.
14 Q.  And what was the context of you telling them that you
15     were a Local 15 member?
16 A.  Just with the benefits and how it can benefit, you
17     know, how it benefited me with the health insurance,
18     because health insurance is very hard to get for a
19     large company when you get not enough participants.
20 Q.  And did you disclose to them or discuss with them that
21     you had health insurance through Local 15's benefit
22     plans?
23 A.  Yes.
24 Q.  So they were aware that you had Local 15 health
25     insurance --

86

1  A.  Yes.
2  Q.  -- fund health insurance?  Do you know what their
3      reaction to that disclosure was?
4  A.  I don't recall.
5  Q.  Did you have any discussions with the Robersons
6      regarding your pension benefits with either the OCI
7      Pension Fund or the Bricklayers International Pension
8      Fund?
9  A.  I don't recall.  I'm sure I did.  Like I say, I'm
10     trying to get my last three years so at 55 I can
11     retire.  So that's kind of like -- so yeah, I'm
12     certain, I'm sure that we did say something, but I
13     don't recall exactly what the wordage was.
14 Q.  Did you discuss with the Robersons or with Mr. Fox that
15     upon the sale and the termination of your employment
16     with Williams, that your Local 15 Welfare Fund coverage
17     would terminate?
18 A.  No.
19 Q.  Did you discuss continuation of your health insurance
20     coverage after the sale?
21 A.  No.
22 Q.  So once your Local 15 Welfare Fund coverage terminated,
23     what kind of health insurance did you have?
24 A.  My wife's.
25 Q.  And who's your wife employed by?

87

1  A.  UNMC.
2  Q.  Did you ever discuss that with the Robersons or Jordan
3      Fox?
4  A.  I don't think so.
5  Q.  Did you discuss Local 15 Welfare Fund benefits
6      regarding other employees besides yourself with the
7      Robersons or Jordan Fox?
8  A.  No.
9  Q.  Did they ever question you regarding Local 15 benefits
10     or health insurance generally for your other employees?
11 A.  No.  Like I say, once we sold -- once I sold the
12     business, it was kind of up to them to work through
13     their problems and their issues.
14 Q.  But you never brought up -- other than mentioning your
15     individual coverage, they never discussed with you any
16     other types of insurance for their employees?
17 A.  No.  We didn't have any other insurance for employees
18     other than the bricklayers that we had working for us.
19 Q.  And you also testified that Williams Restoration had a
20     401(k) plan?
21 A.  Yes.
22 Q.  Do you know who that covered?
23 A.  Anybody that signed up.
24 Q.  And could the Local 15 members participate in that
25     401(k) plan?

88

1  A.  Yes.
2  Q.  Did you discuss the 401(k) plan with the Robersons or
3      with Mr. Fox?
4  A.  I told them that we had one in place, but they elected
5      to start their own.
6  Q.  Do you know what happened to the 401(k) plan after the
7      sale of Williams Restoration?
8  A.  I believe we closed it and distributed -- let the guys
9      take their money and invest it wherever.
10 Q.  Do you know who the administrator of that 401(k) plan
11     was?
12 A.  I believe it was Tom Schleisman.
13 Q.  Did you have any legal representation during the sale
14     of Williams Restoration?
15 A.  Yes.
16 Q.  Who was that?
17 A.  Dave Buelt.
18 Q.  Did he represent you throughout the sale?
19 A.  Yes.
20 Q.  Do you know if Fox Holdings had legal representation
21     during the sale?
22 A.  Yes.
23 Q.  Do you know who that was?
24 A.  Sederstrom.
25 Q.  Erickson Sederstrom?

89

1   A.   Yes.

2   Q.   Did you have any direct communication with Erickson

3      Sederstrom regarding the sale?

4   A.   No.

5   Q.   Everything went through Mr. Buelt?

6   A.   Correct.

7   Q.   I'm going to hand you what I'm going to mark as

8      Exhibit 18.

9          (Exhibit 18 marked for identification)

10   Q.   Do you recognize that document?

11   A.   No, I don't.

12   Q.   Was that something that -- it was mailed to Williams

13      Restoration on May 6, 2015. Would you have been in

14      charge of the company at the time that was mailed to

15      Williams Restoration, or would that have been Fox

16      Holdings?

17   A.   Fox Holdings would have been. Yeah, this is 2015.

18   Q.   Do you recall requesting withdrawal liability

19      information from the international pension fund?

20   A.   Yes.

21   Q.   You did?

22   A.   Yes.

23   Q.   Do you know when that was?

24   A.   It was prior to us selling, because that was a

25      stipulation. If there was going to be pension

90

1      liability for me, then I wasn't going to go through

2      with the sale.

3   Q.   Do you understand if that letter was in response to

4      your request for information regarding withdrawal

5      liability?

6          MS. BORYCA: Objection; lack of

7      foundation. You can still answer the question.

8   Q.   (BY MR. SOLLARS) You can answer.

9   A.   Could you repeat it. I'm sorry.

10   Q.   Do you believe that that letter was in response to your

11      withdrawal liability information request to the

12      international pension fund?

13   A.   Yeah, I don't think -- I don't know.

14   Q.   All right. Thank you. You can set that aside.

15   A.   Okay.

16   Q.   I'm going to go back to the asset purchase agreement.

17      That was Exhibit --

18   A.   14.

19   Q.   Yeah, 14. You testified -- and I'd like you to flip to

20      page seven. Excuse me. Never mind. Can we go off the

21      record.

22          (Off-the-record discussion)

23   Q.   Once you entered into the asset purchase agreement,

24      what were the mechanics of the sale? What were the

25      terms of the sale, I guess? What was the sale price?

91

1   A.   2.2 million, and they purchased 300,000 of my accounts

2      receivable.

3   Q.   They purchased 300,000 of your accounts receivable?

4   A.   Yes.

5   Q.   Do you know what the total value of your accounts

6      receivable at the time of the sale were?

7   A.   Somewhere close to 500,000.

8   Q.   So the sale price was $2.2 million in cash and 300,000

9      of your accounts receivable?

10   A.   Correct.

11   Q.   And did they purchase all of your equipment?

12   A.   I would say 90 percent. I kept some of it for myself.

13   Q.   What types of equipment did you keep for yourself?

14   A.   Mostly trailers and a skid loader.

15   Q.   Do you know if you executed any document that excluded

16      any equipment from the sale?

17   A.   We did not.

18   Q.   So how did you determine what was excluded from the

19      sale and what was not?

20   A.   I didn't put it on the equipment list.

21   Q.   Do you know if you retained that equipment list in your

22      correspondence or your email?

23   A.   I don't know for sure. I'm certain that Sunbelt has

24      that.

25   Q.   So that equipment list was something that you provided

92

1      to Sunbelt?

2   A.   Correct.

3   Q.   Did you get a receipt from Fox Holdings as to what

4      transferred?

5   A.   Of the equipment?

6   Q.   Yeah.

7   A.   They did an appraisal of it. That would be about the

8      only thing that I would have gotten. They appraised

9      the value of everything that was on the equipment list.

10   Q.   And so the building that you owned at 725 North

11      Frontier, that was not included in the sale?

12   A.   Correct.

13   Q.   Why was that not included?

14   A.   It just wasn't. We retained the building.

15   Q.   And some vehicles were transferred from Williams

16      Restoration to Fox Holdings? Was that the case?

17   A.   Correct.

18   Q.   How many vehicles did you have?

19   A.   I believe there was seven. I could be off on that.

20   Q.   I'm going to hand you what we'll mark as 19.

21          (Exhibit 19 marked for identification)

22   Q.   So you had seven vehicles. This is a list of --

23   A.   Yeah. I'm counting. Yeah, there was more than seven,

24      I guess.

25   Q.   So I count 14 pages of vehicles, so approximately 14

97

1  **Q.**  So was that audit going on at the same time you were
2       selling the business?
3  **A.**  **No.  That was a year after.**
4  **Q.**  The audit was a year after the sale?
5  **A.**  **Yes.**
6  **Q.**  How were you involved in Deboer and Associates audit of
7       Williams then?
8  **A.**  **The funds sent us a letter stating that they needed to**
9       **audit our accounts, so I went, and the Deboer**
10      **individuals went down to my secretary at the time and**
11      **got all the information from her.  She handled all the**
12      **audits and stuff like that with the union.**
13  **Q.**  And who was your secretary?
14  **A.**  **Jean Stewart.**
15  **Q.**  And how long had she worked for Williams?
16  **A.**  **Approximately ten years.  No.  Probably longer than**
17      **that, even.**
18  **Q.**  And she was the secretary?
19  **A.**  **Correct.**
20  **Q.**  Is she still employed by Williams?
21  **A.**  **No.**
22  **Q.**  Do you know why she's not?
23  **A.**  **She retired.**
24  **Q.**  Was she retained by Fox Holdings after they purchased
25      Williams Restoration?

98

1  **A.**  **Yes.**
2  **Q.**  Do you know how long she kept working for Williams
3       after the sale?
4  **A.**  **Till October of this year.**
5  **Q.**  And then she retired?
6  **A.**  **Correct.**
7            (Recess taken at 1:12 p.m., and
8            deposition resumed at 1:17 p.m.)
9  **Q.**  Could you go back to Exhibit 14, please.  I'd like you
10      to turn to page 14, and that's your signature on this
11      asset purchase agreement, correct?
12  **A.**  **Correct.**
13  **Q.**  And this is the final asset purchase agreement between
14      Williams Restoration and Fox Holdings?
15  **A.**  **Correct.**
16  **Q.**  And Ms. Boryca questioned you regarding article 3.10 on
17      page seven.  I just want to ask you a couple of
18      questions about that.
19         The section states, quote, seller employs and has
20      employed union employees, specifically Bricklayers
21      Union members, and has been party to the overall union
22      contract, end quote.  Is that an accurate recitation of
23      that clause?
24  **A.**  **Yes.**
25  **Q.**  And you testified earlier that you had requested that

99

1      this language be inserted in the asset purchase
2      agreement; is that correct?
3  **A.**  **Yes.**
4  **Q.**  And again, could you restate why you insisted that this
5      language be inserted in this agreement.
6  **A.**  **Because we were a union -- we employed union people.**
7      **We had a union contract.**
8  **Q.**  And at the time that you executed this agreement,
9      Williams Restoration was signatory to a collective
10      bargaining agreement with Bricklayers Local 15; is that
11      correct?
12  **A.**  **Correct.**
13  **Q.**  Did you have any response from Fox Holdings, the
14      Robersons or Mr. Fox, regarding the insertion of this
15      language?
16  **A.**  **I don't recall exact words.**
17  **Q.**  Do you recall if there was a negotiation with the
18      Robersons, Fox Holdings or Sunbelt regarding this
19      language?
20  **A.**  **I don't believe so.**
21  **Q.**  Were you privy to any contract negotiations between Mr.
22      Buelt and the attorneys for Fox Holdings?
23  **A.**  **I don't believe so.**
24  **Q.**  Could there have been negotiation of contract language
25      that you weren't aware of?

100

1  **A.**  **Possibly.**
2           MR. SOLLARS:  Can we go off the record
3      for a second.
4           (Off-the-record discussion)
5           (Exhibit 20 marked for identification)
6  **Q.**  (BY MR. SOLLARS)  I've put in front of you a document
7      that we marked as Exhibit 20.  Do you recognize that
8      document?
9  **A.**  **Yes.**
10  **Q.**  Could you tell me what it is.
11  **A.**  **It was the original asset purchase agreement for me to**
12      **look over.**
13  **Q.**  Do you know who you received that from?
14  **A.**  **I believe it was through Andrew.**
15  **Q.**  Andrew Foxhoven?
16  **A.**  **Correct.**
17  **Q.**  Did you receive it directly from Mr. Foxhoven or
18      through Mr. Buelt?
19  **A.**  **No.  Through Andrew.**
20  **Q.**  Through Andrew?
21  **A.**  **Yeah.  It was a meeting at their office with just me**
22      **and them.**
23  **Q.**  A meeting at Sunbelt's office?
24  **A.**  **Yeah.**
25  **Q.**  And it was between just yourself, Fox Holdings and

101

1    Sunbelt?

2  **A.**  **Yes.  No, not Fox Holdings wasn't there at this time.**

3  **Q.**  It was just you and Sunbelt?

4  **A.**  **Yes.**

5  **Q.**  And this was not the final agreement; is that correct?

6  **A.**  **No.  We had to change the organized labor matters**

7    **paragraph.**

8  **Q.**  And that's section 3.10 again?

9  **A.**  **Correct.**

10  **Q.**  And what was your issue with section 3.10?

11  **A.**  **The verbiage in it.  The seller had not been bound and**

12    **currently bound by union contract.**

13  **Q.**  So you objected to that because you believed that

14    language was not accurate?

15  **A.**  **Yes.**

16  **Q.**  And what did you suggest?  Did you have Mr. Buelt draft

17    language or --

18  **A.**  **I don't remember if it was Dave that did that or if it**

19    **was Fox Holdings, or I'm sorry, I meant Sunbelt, that**

20    **re-did that, and then I showed it to Dave Buelt and had**

21    **him look it over.**

22  **Q.**  Did you receive any draft language from Sunbelt or Fox

23    Holdings that was different from the final language in

24    the signed asset purchase agreement regarding section

25    3.10?

102

1  **A.**  **No.**

2  **Q.**  Were there other issues in this asset purchase

3    agreement that were modified between this draft and the

4    final agreement?

5  **A.**  **No.**

6  **Q.**  I'm going to refer you to section 1, 1.2 and 1.3.  Did

7    you ever discuss with Sunbelt or the Robersons or

8    Jordan Fox the assumption or exclusion of liabilities

9    in those sections?

10  **A.**  **No.**

11            MR. SOLLARS:  Could we go off the record

12    for a second.

13            (Off-the-record discussion)

14          (Exhibit 21 marked for identification)

15  **Q.**  (BY MR. SOLLARS)  I'm going to give you what we've

16    marked as Exhibit 21.  Have you ever seen that document

17    before?

18  **A.**  **No.**

19  **Q.**  Could you take a moment and review it for me.

20  **A.**  **Okay.**

21  **Q.**  Do you ever recall a discussion regarding the scope of

22    assumed or excluded liabilities?

23  **A.**  **No.**

24  **Q.**  And your attorney did not share that email with you?

25  **A.**  **Obviously I was copied on it, but like I said early on**

103

1    **in this, there's a lot of these things that I don't**

2    **understand, so that's why I pay him to understand that**

3    **and talk to me in a term that I understand, I guess.**

4  **Q.**  Do you recall any discussions with Mr. Buelt regarding

5    the subject matter of that email?

6  **A.**  **I do not.**

7  **Q.**  Thank you.  You can set that aside.

8            MR. SOLLARS:  Can we go off the record

9    for a second.

10            (Off-the-record discussion)

11      (Exhibits 22 and 23 marked for identification)

12          (Recess taken at 1:26 p.m., and

13          deposition resumed at 1:33 p.m.)

14  **Q.**  (BY MR. SOLLARS)  I'm going to hand you what we've

15    marked as 22.  Have you seen that document before?

16    It's Bates stamped Fox 223 through 225.

17  **A.**  **No.**

18  **Q.**  You haven't seen that?  I'd like to refer you to page

19    Fox 224, so it looks like it's a list of equipment.

20  **A.**  **Yes.**

21  **Q.**  And that's the appraisal that you referenced earlier in

22    your testimony; is that correct?

23  **A.**  **Correct.**

24  **Q.**  And just reviewing 224 and 225, is that all of the

25    equipment of Fox Holdings at the time of sale?

104

1  **A.**  **I believe so.**

2  **Q.**  And all of that equipment transferred and was sold to

3    Fox Holdings?

4  **A.**  **Yes.**

5  **Q.**  And reviewing that, do you see any equipment that was

6    not transferred to Fox Holdings?

7  **A.**  **No.**

8  **Q.**  Do you know if there was another list of equipment that

9    you retained that wasn't subject to the sale?

10  **A.**  **No.**

11  **Q.**  I'm going to hand you what we've marked as Exhibit 23.

12    Have you seen that email before?

13  **A.**  **No.**

14  **Q.**  Do you know whose email address is the RRhand1@aol.com?

15  **A.**  **I do not.**

16  **Q.**  Do you know what this email is referencing?

17  **A.**  **I do not.**

18  **Q.**  And do you recognize the phone number referenced Jared

19    402-616-3865?

20  **A.**  **That would have been Jared.**

21  **Q.**  Skaff?

22  **A.**  **Skaff, yeah.**

23  **Q.**  And was he the Bricklayers' business agent?

24  **A.**  **Correct.**

25  **Q.**  On October 23rd, 2014?

105

1  A.  Yes.
2  Q.  And do you know why Jared would be expecting a call
3      from Jordan Fox or the email address listed as RRhand1?
4  A.  I do not.
5  Q.  Had you encountered the RRhand1 as Dickie Roberson?
6  A.  I never had any contact like that with them.
7  Q.  After the sale closed to Fox Holdings, could you
8      describe what happened.  Did you give up your keys and
9      walk away, or was there some other process?
10 A.  I had a 30 day to kind of show them around, show them
11     the ropes kind of thing.  Then after that 30 days was
12     up, then I was done.
13 Q.  Did anything change during the 30 days after the sale?
14 A.  No.
15 Q.  Did Fox Holdings change the keys to the doors?
16 A.  I do not know that.
17 Q.  Well, during the time, during the 30 days after you
18     remained as a consultant, did they do anything, like
19     changing the locks on the doors?
20 A.  I'm not aware of that.
21 Q.  Did any of the telephone numbers change?
22 A.  No.
23 Q.  Did any of the mailing addresses change?
24 A.  No.
25 Q.  Did you still get a paycheck from Williams Restoration?

106

1  A.  No.
2  Q.  Do you know if any of the paychecks to the employees
3      changed?
4  A.  Not that I'm aware of.
5  Q.  Looking back at the job list that you discussed
6      earlier, what's a typical construction contract that
7      Williams engaged in in terms of dollar amounts?
8  A.  It varied.
9  Q.  And how long is the typical project that Williams
10     engaged in?
11 A.  It varied.
12 Q.  Do you have any projects that you would describe as a
13     routine type of project that Williams engaged in?
14 A.  Like a service contract?
15 Q.  Yeah.
16 A.  No.
17 Q.  Were you bidding projects up until the time of the
18     sale?
19 A.  Yes.
20 Q.  And were you bidding those on behalf of Williams, or
21     were you bidding those on behalf of Fox Holdings?
22 A.  On behalf of Williams.
23 Q.  So if something was bid for Williams Restoration and it
24     overlapped between the time of the sale, did Fox
25     Holdings perform that contract?

107

1  A.  Most likely, yes.
2  Q.  Were you involved in any bidding after the sale?
3  A.  No.
4  Q.  And who was bidding after the sale?
5  A.  The estimators, Roger and Jeremy.
6  Q.  Do you know if Fox Holdings assumed the contracts that
7      were already in place after the sale?
8  A.  I believe so.
9  Q.  So they performed contracts that were already in place
10     after the sale?
11 A.  Yes.
12 Q.  Did you have any primary vendors of equipment or
13     material?  Like who did you buy your material from?
14 A.  Usually Stetson's or Watkins.
15 Q.  And do you know if Fox Holdings continued to utilize
16     Stetson's and Watkins?
17 A.  Yes.
18 Q.  They did?
19 A.  Yes.
20 Q.  And what kind of material did Williams Restoration buy
21     from Stetson's?
22 A.  Sealants.
23 Q.  And what kind of material did Williams buy from
24     Watkins?
25 A.  Mostly block, masonry.

108

1  Q.  And is it your understanding that Fox Holdings
2      continued to buy sealants from Stetson's?
3          MS. BORYCA:  Objection; lack of
4      foundation.
5  Q.  (BY MR. SOLLARS)  You can answer.
6  A.  As far as I know, yes.
7  Q.  And same question for Watkins.
8  A.  Yes --
9          MS. BORYCA:  Same objection.
10         THE WITNESS:  -- as far as I know.
11 Q.  (BY MR. SOLLARS)  As far as you know?
12 A.  Yes.
13 Q.  And in terms of material suppliers, how much -- in
14     percentage terms how much of your material did you buy
15     from Stetson's?
16 A.  Ten percent.
17 Q.  How about from Watkins?
18 A.  Ninety.
19 Q.  Ninety?
20 A.  Yeah.
21 Q.  And are those two companies the main vendor you would
22     use for material?
23 A.  Yes.
24 Q.  Just to confirm, I think you've already testified about
25     this, but after the sale your welfare benefits through

109

1    the Local 15 Welfare Fund terminated; is that correct?
2  **A.  Yes.**
3  **Q.**  Do you know approximately when those terminated?
4  **A.  I think it was nine months.**
5  **Q.**  Did any employees of Williams Restoration talk to you
6    about their Local 15 benefits after the sale?
7  **A.  No.**
8  **Q.**  Were you aware of any benefit issues with Local 15
9    members after the sale?
10 **A.  No.**
11 **Q.**  You previously testified that there were approximately
12   five or six Local 15 members prior to the sale; is that
13   correct?
14 **A.  Correct.**
15 **Q.**  Could you name those five or six people off the top of
16   your head?
17 **A.  Myself, Doug Tiefenthaler, Tom Burford, Tom, Jr.**
18 **Q.**  And that's Tom Burford, Jr.?
19 **A.  Correct.  I had all this stuff written down last night.**
20 **    We signed up Mike Packett, Rafael Ramirez and Tyler**
21 **    Patterson, then Mike Peters, and then Fred Hoover.**
22 **    Yeah, we signed up those four guys.**
23 **Q.**  How about Tom Tsosie?
24 **A.  Tsosie.**
25 **Q.**  Yeah.

110

1  **A.  Yeah, he was one of our laborers.**
2  **Q.**  And all of the Tsosies were laborers?
3  **A.  Correct.**
4  **Q.**  So they were never Local 15 members?
5  **A.  Correct.**
6  **Q.**  And they were not performing covered work?
7  **A.  Correct.**
8  **Q.**  So you testified earlier that Jean Stewart was your
9    secretary, and was she typically responsible for
10   filling out the remittance reports to the funds?
11 **A.  Yes.**
12 **Q.**  You never filled out and filed the remittance reports
13   yourself?
14 **A.  Never.**
15 **Q.**  Did anyone else ever do that?
16 **A.  No.**
17 **Q.**  You previously testified there was approximately 22, 23
18   employees prior to the time of the sale; is that
19   correct?
20 **A.  Give or take, yeah.  It varied, depending on weather**
21 **    and workload.**
22 **Q.**  And I'm just going to go through some employee names
23   and see if you can identify who they are and how long
24   they worked there.  Corey Behrens, was he an employee?
25 **A.  Yes.**

111

1  **Q.**  Do you know how long he had worked at Williams?
2  **A.  Off and on probably two or three years.**
3  **Q.**  Prior to the sale?
4  **A.  Yeah.**
5  **Q.**  And was he a nonunion employee?
6  **A.  Correct.**
7  **Q.**  And what did he do?
8  **A.  Mostly flatwork, caulking-wise.**
9  **Q.**  Concrete flatwork?
10 **A.  Correct.**
11 **Q.**  Jose Ramirez?
12 **A.  He was just a general laborer.**
13 **Q.**  And do you know how long he had worked for --
14 **A.  I want to say five years.**
15 **Q.**  Do you know what he did?
16 **A.  He was just a general laborer.  He actually would help**
17 **    mix mortar and stuff like that for restoration jobs.**
18 **Q.**  Do you know if he continued on after the sale?
19 **A.  As far as I know.**
20 **Q.**  He did?  Juan Estrada?
21 **A.  Laborer.**
22 **Q.**  Do you know how long he had worked?
23 **A.  Probably eight years.**
24 **Q.**  And do you know if he continued on after the sale?
25 **A.  He did for a short time, yes.**

112

1  **Q.**  For a short time?
2  **A.  Yeah.**
3  **Q.**  Do you know what happened to him?
4  **A.  He got terminated.**
5  **Q.**  Do you know why he was terminated?
6  **A.  Not really.**
7  **Q.**  Doug Tiefentaler?
8  **A.  He was a pointer caulker.**
9  **Q.**  Do you know how long he was employed by Williams prior
10   to the sale?
11 **A.  Eighteen years.**
12 **Q.**  Do you know if he continued on after the sale?
13 **A.  For a short time.**
14 **Q.**  Do you know why he left or was terminated?
15 **A.  Because he quit paying the benefits in.**
16 **Q.**  Do you know if he quit or if he was fired?
17 **A.  I do not know that.**
18 **Q.**  Philip Sweeney?
19 **A.  He worked for us.  We had signed him up, so he was**
20 **    going to be a caulker.**
21 **Q.**  You signed him up with Local 15?
22 **A.  Correct.**
23 **Q.**  Do you know how long he had worked for Williams prior
24   to the sale?
25 **A.  Maybe a year.**

**113**

1  Q.  Do you know if he continued on?
2  A.  He did not.
3  Q.  Do you know why?
4  A.  He pursued other interests.
5  Q.  Do you know when he left?
6  A.  I do not.
7  Q.  Do you know if it was shortly after --
8  A.  I do not.
9  Q.  Juan Sierra, do you know how long he worked for
10     Williams?
11  A.  Probably eight years, nine years.
12  Q.  Do you know what he did?
13  A.  Mostly below grade caulking.
14  Q.  Was he a Local 15 member?
15  A.  No.
16  Q.  Do you know if he continued on after the sale?
17  A.  He did for awhile.
18  Q.  Do you know why he let?
19  A.  To pursue another job offer.
20  Q.  Do you know if he went to another contractor in the
21     area?
22  A.  I believe so.
23  Q.  Do you know which one?
24  A.  I believe it was Senegal.
25  Q.  Are they a signatory with the Local 15?

**114**

1  A.  No.
2  Q.  No?
3  A.  No.
4  Q.  Rudolfo Bravo?
5  A.  He was kind of just a general laborer, caulker.
6  Q.  Do you know how long he had worked for Williams
7     Restoration prior to the sale?
8  A.  I want to say a couple years.
9  Q.  Do you know if he continued after the sale?
10  A.  I believe so.
11  Q.  Willian Arando?
12  A.  Yes.
13  Q.  Was he an employee prior to the sale?
14  A.  Yes.
15  Q.  Do you know how long he had been an employee?
16  A.  A couple years.
17  Q.  And what did he do?
18  A.  Mostly, like I say, caulking and below grade.
19  Q.  So again, not a Local 15 member?
20  A.  No.
21  Q.  Do you know if he continued after the sale?
22  A.  Yes.
23  Q.  Do you know how long he continued to work for Fox
24     Holdings?
25  A.  I do not.

**115**

1  Q.  Do you know if he's currently employed there?
2  A.  I do not.
3  Q.  Mark Cruise?
4  A.  Yes.
5  Q.  Do you know how long he worked at Williams prior to the
6     sale?
7  A.  A couple years.
8  Q.  Do you know what he did?
9  A.  He was a caulker, water proofer.
10  Q.  Was he a Local 15 member?
11  A.  No.
12  Q.  Was he doing bargaining at work in your opinion?  Was
13     he doing covered bargaining at work, or was he doing
14     uncovered work?
15  A.  No.  Uncovered.  Mostly flatwork.  And we did a lot of
16     parking lots and big lots and stuff like that, caulked
17     them.
18  Q.  Do you know if he continued on after the sale?
19  A.  Yes.
20  Q.  Do you know if he's still employed there?
21  A.  As far as I know.
22  Q.  Tom Borford, Sr.?
23  A.  Uh-huh.
24  Q.  Was he employed by Williams?
25  A.  Yes.

**116**

1  Q.  Do you know how long prior to the sale?
2  A.  I think Tom worked for me for almost ten years.
3  Q.  And you've previously stated that he was a Local 15
4     member?
5  A.  Correct.
6  Q.  Do you know if he continued on after the sale to Fox
7     Holdings?
8  A.  Yes.
9  Q.  Do you know if he's still employed there?
10  A.  Yes.
11  Q.  Tom Burford, Jr.?
12  A.  Ten years.
13  Q.  Ten years prior to the sale?
14  A.  Correct.
15  Q.  And he's Tom Burford, Sr.'s son?
16  A.  Correct.
17  Q.  And a Local 15 member?
18  A.  Correct.
19  Q.  Do you know if he continued on after the sale?
20  A.  Yes.
21  Q.  And does he still work there?
22  A.  No.
23  Q.  Do you know why he doesn't work there?
24  A.  He took a job with another company.
25  Q.  Do you know which company?

**117**

1  **A.**  **Owens Restoration.**

2  **Q.**  Tom Tsosie, which I think you've already testified, he

3      was employed by Williams Restoration; is that correct?

4  **A.**  **Correct.**

5  **Q.**  Do you know how long he was employed prior to the sale?

6  **A.**  **All the Tsosies worked for me for at least 15 years.**

7  **Q.**  So that's Tom Tsosie, Kevin Tsosie, Tommy Tsosie --

8  **A.**  **Uh-huh.**

9  **Q.**  -- and then Daniel Tsosie?

10  **A.**  **Correct.**

11  **Q.**  And they were all employed for approximately ten years?

12  **A.**  **Yeah. Fifteen.**

13  **Q.**  And were they Local 15 members?

14  **A.**  **No.**

15  **Q.**  And what were they doing?

16  **A.**  **Below grade waterproofing.**

17  **Q.**  Do you know if they continued on after the sale?

18  **A.**  **For a short time, yes.**

19  **Q.**  Do you know what happened to them?

20  **A.**  **They quit.**

21  **Q.**  Do you know why they quit?

22  **A.**  **I don't.**

23  **Q.**  I think you've previously testified on Mike Peters. He

24      was a Williams employee; is that correct?

25  **A.**  **Correct.**

**118**

1  **Q.**  And he was a Local 15 member; is that correct?

2  **A.**  **Correct.**

3  **Q.**  Do you know if he continued on with Fox Holdings after

4      the sale?

5  **A.**  **Yes.**

6  **Q.**  And do you know if he's still employed there?

7  **A.**  **No.**

8  **Q.**  He is not?

9  **A.**  **He is not.**

10  **Q.**  Do you know why he's not?

11  **A.**  **I think he went back to working for the union with**

12      **Owens Restoration.**

13  **Q.**  And who is Barbara Weber?

14  **A.**  **That was our other secretary.**

15  **Q.**  How long had she worked for Williams prior to the sale?

16  **A.**  **Probably a year, year and a half.**

17  **Q.**  Prior to the sale, just a year?

18  **A.**  **Yeah.**

19  **Q.**  Do you know if she continued on?

20  **A.**  **Yes.**

21  **Q.**  And do you know if she still works there?

22  **A.**  **Yes.**

23  **Q.**  Jean Stewart, you've previously testified she worked

24      there and retired; is that correct?

25  **A.**  **Correct.**

**119**

1  **Q.**  And she continued on after the sale in her same

2      capacity; is that correct?

3  **A.**  **Correct.**

4  **Q.**  Cesar Ramirez?

5  **A.**  **I'm trying to think who that is. He probably worked as**

6      **a caulker. He wasn't a union guy. I'm trying to think**

7      **of who that is, though. Oh, yeah. No. He was just --**

8      **yeah, I remember him now. No. He was just a caulker.**

9  **Q.**  And do you recall how long he had worked for Williams

10      prior to the sale?

11  **A.**  **Approximately two years.**

12  **Q.**  And do you know if he continued on after the sale?

13  **A.**  **As far as I know.**

14  **Q.**  Do you know if he's still employed there?

15  **A.**  **I do not.**

16  **Q.**  Juan Salazar?

17  **A.**  **Yeah.**

18  **Q.**  Was he also a nonunion caulker?

19  **A.**  **Correct. Below grade guy.**

20  **Q.**  Do you know how long he had been employed by Williams

21      prior to the sale?

22  **A.**  **Five years.**

23  **Q.**  Do you know if he continued on after the sale?

24  **A.**  **He did.**

25  **Q.**  Do you know if he's still working there?

**120**

1  **A.**  **He is not.**

2  **Q.**  Do you know why he's not?

3  **A.**  **He's incarcerated.**

4  **Q.**  Rafael Ramirez?

5  **A.**  **Yes.**

6  **Q.**  Do you know how long he was working prior to the sale?

7  **A.**  **Approximately ten years.**

8  **Q.**  Do you know if he continued on after the sale?

9  **A.**  **Yes.**

10  **Q.**  And what did he do?

11  **A.**  **He was a caulker. Then we got him into the union**

12      **towards the very end, you know, probably six to eight**

13      **months before the sale.**

14  **Q.**  So he was a Local 15 member?

15  **A.**  **Yes.**

16  **Q.**  Do you know if he's still working there?

17  **A.**  **Yes.**

18  **Q.**  Claudio Vargas?

19  **A.**  **Uh-huh. Yes.**

20  **Q.**  Was he employed by Williams prior to the sale?

21  **A.**  **Yes.**

22  **Q.**  What did he do?

23  **A.**  **Mostly structural grout, below grade.**

24  **Q.**  Do you know if he continued after the sale?

25  **A.**  **Yes.**

121

1  Q.  Do you know if he's still employed there?
2  A.  He is not.
3  Q.  Do you know why?
4  A.  He quit.
5  Q.  Do you know why he quit?
6  A.  Money.
7  Q.  In terms of money, was it because --
8  A.  Somebody offered him more money.
9  Q.  Okay. Thank you. Fred Hoover, you previously
10     testified that he was a Local 15 member employed by
11     Williams; is that correct?
12 A.  Correct.
13 Q.  Do you know if he continued on after the sale to Fox
14     Holdings?
15 A.  He did.
16 Q.  Do you know if he still works there?
17 A.  He does not.
18 Q.  Do you know why he does not?
19 A.  He went to work for Owens.
20 Q.  Mike Packett, was he a Williams employee?
21 A.  Yes.
22 Q.  Do you know how long he was?
23 A.  Off and on probably five years.
24 Q.  Was he a Local 15 member?
25 A.  He was at the end.

122

1  Q.  Do you know, did he keep on working for Fox Holdings
2      after the sale?
3  A.  Yes.
4  Q.  Do you know if he works there still?
5  A.  No.
6  Q.  Jeremy Shear?
7  A.  He's an estimator.
8  Q.  And how long had he worked for Williams prior to the
9      sale?
10 A.  Two years.
11 Q.  Do you know if he continued after the sale?
12 A.  He did.
13 Q.  Do you know if he works there still?
14 A.  He does not.
15 Q.  Do you know why he does not?
16 A.  He was terminated.
17 Q.  James Gregalunas, does that name ring a bell?
18 A.  Uh-huh.
19 Q.  And was he an employee of Williams prior to the sale?
20 A.  Yeah.
21 Q.  Do you know how long he had worked?
22 A.  Off and on, ten years.
23 Q.  Was he a Local 15 member?
24 A.  No. He was a shop driver. He drove materials and
25     stuff for me.

123

1  Q.  Did he continue on after the sale?
2  A.  Yes.
3  Q.  And was he doing the same type of work that he did
4      prior to the sale?
5  A.  Yes.
6  Q.  Do you know if he's still working there?
7  A.  Yes.
8  Q.  Pedro Calderon-Torres, was he a Williams employee?
9  A.  Yes.
10 Q.  What did he do?
11 A.  Caulker, below grade.
12 Q.  Did he continue on after the sale?
13 A.  Yes.
14 Q.  Do you know if he's still working there?
15 A.  Yes.
16 Q.  Of those individuals, you testified Jeremy Shear was an
17     estimator?
18 A.  Yes.
19 Q.  Were there any individuals that I mentioned that
20     were -- that was your only estimator; is that correct?
21 A.  No. Roger Winlin was my other estimate.
22 Q.  Was he working at the time of the sale?
23 A.  Yes.
24 Q.  And did he continue on working?
25 A.  Yes.

124

1  Q.  Other than yourself in terms of management, did you
2      have any other management employees?
3  A.  I had two superintendents.
4  Q.  And who were they?
5  A.  Tyler Patterson and Doug Tiefentaler.
6  Q.  And Tyler Patterson, was he a Local 15 member?
7  A.  He was at the end.
8  Q.  And what type of work did he do?
9  A.  Mostly supervision, ran the jobs.
10 Q.  Did he work his way up to be a superintendent?
11 A.  He actually worked for another company that -- that's
12     where a lot of these guys, a lot of the ones that I
13     said came in two to three years, he worked for another
14     company, and we actually bought -- you know, they were
15     going under, so we actually -- all of his guys came
16     over with him.
17 Q.  What company was that?
18 A.  Corporate Construction I think is the name of it.
19 Q.  Do you know if Mr. Patterson is still employed by --
20 A.  He is not.
21 Q.  Do you know why?
22 A.  I do not.
23 Q.  And you said Jeremy Shear was another estimator who you
24     would consider management as well; is that an accurate
25     statement?

125

**A.** I wouldn't call him management, but I would call him an estimator.

**Q.** Were there any other people that you would consider management of Williams Restoration?

**A.** No.

**Q.** And you testified you had two office employees, Ms. Weber and Ms. Stewart; is that correct?

**A.** Correct.

**Q.** But no other office employees?

**A.** Other than the estimators. They were in the office all the time.

**Q.** The estimators were in the office all the time?

**A.** Correct.

**Q.** And do you know of anyone that I did not list that were employees at the time of the sale?

**A.** I would have to look and see, look at the list, to be honest with you.

**Q.** So we went through a list of 27 employees. You testified there were around approximately 22 employees at the time of the sale. So we just discussed 27. Do you believe that would encompass all of the employees that --

**A.** I believe so, yes.

**Q.** Let me know if you want to take a break.

**A.** Just get 'er done.

126

**Q.** I'm going to switch gears. If you wouldn't mind picking up the job list, which I think was Exhibit 4.

(Exhibit 24 marked for identification)

**Q.** You have Exhibit 4 in front of you, and I've marked a job list as Exhibit 24, and just for the record, this is an Excel spreadsheet that was provided by Williams Restoration.

I modified the formatting of the job list to fit it on one page. I deleted a number of columns from the material that was provided in the Excel spreadsheet, but I didn't add anything to it or delete any substantive material that will be discussed today.

MS. OTT: One clarification, Mr. Sollars. You said this was produced by Williams Restoration?

MR. SOLLARS: Excuse me. Produced by Fox Holdings. I'm sorry.

MS. BORYCA: And I want to say for the record, I believe we produced this electronically in Excel format, and so we didn't mark any of the legions, but we did mark the file.

And I think I noted by letter that this is confidential under the protective order, and maybe it was the highly confidential, marked as attorneys' eyes only.

127

And so I believe it's appropriate for Mr. Williams to review this today in his deposition, but following the deposition, we would expect it to be treated as attorneys' eyes only, still under the protective order.

MR. SOLLARS: Okay.

**Q.** (BY MR. SOLLARS) I'm going to go back to the Exhibit 4 briefly. Earlier you testified that you believe you provided this job list to some auditors. Is that correct?

**A.** Correct.

**Q.** It's got a date on it of October 6, 2016. Do you believe that is when you created it?

**A.** I do. Like I say, I think this is when my secretary probably printed it off for me.

**Q.** And is the job list something that you maintained in the ordinary course of business?

**A.** Not necessarily.

**Q.** I'm just trying to get at how you keep track of jobs and how this list came together, if you have any insight on that.

**A.** This was more of a just to see how much my estimators were getting job-wise. It wasn't any specific thing, and we had files in the file cabinet, so . . .

**Q.** So you wouldn't have maintained a job list year to year?

128

**A.** No. We started to towards the end just so I could kind of see who was getting the majority of the jobs and who wasn't.

**Q.** But do you believe this to be, in reviewing it, an accurate list of all of Williams Restoration's jobs in 2014?

**A.** The best of my knowledge.

**Q.** For the column titled amount, is that the amount of the contract price?

**A.** Yes.

**Q.** So that's what Williams Restoration was paid for performing the contract?

**A.** Yes.

**Q.** And is that the final contract amount?

**A.** Yes.

**Q.** And do you know if the amount -- would that have been your bid amount, too, or is that the final cash that was paid to Williams?

**A.** I believe this was the final cash that was paid to us.

**Q.** So in going through the list, at least on the first page there are quite a few projects under $5,000 and a number under $3,000.

At least on the first page, is that an accurate recitation of the type of work that Williams Restoration was doing prior to the sale?

129

1   **A.**   **Yes.**
2   **Q.**   And on the first page there's a ConAgra Food 72nd
3      Street parking garage project. Do you see that one,
4      about three-quarters of the way down the first page?
5   **A.**   **Yes.**
6   **Q.**   And the contract price on that one was $80,500?
7   **A.**   **Yes.**
8   **Q.**   Would that have been one of the larger projects that
9      Williams would have performed in 2014?
10   **A.**   **No. It was one of the larger ones, yes, but we did**
11      **bigger ones.**
12   **Q.**   But in comparison to the other projects at least on
13      this page, that was the largest?
14   **A.**   **Yes.**
15   **Q.**   Do you know, could you give an approximation of how
16      long it would have taken for that project to be
17      completed?
18   **A.**   **It took us almost a month.**
19   **Q.**   And do you have any recollection of when that project
20      was performed?
21   **A.**   **Timeframe, you mean?**
22   **Q.**   Yes.
23   **A.**   **In the fall.**
24   **Q.**   The fall of 2014?
25   **A.**   **Yeah. I'm sorry. It would have been spring, because**

130

1      **it was done before the sale.**
2   **Q.**   I'm going to refer you to Exhibit 24 that we discussed
3      earlier. Would you mind flipping to page seven of that
4      document. And again, about three-quarters of the way
5      down there's a project listed by Fox Holdings, the
6      ConAgra parking garage project.
7   **A.**   **Yes.**
8   **Q.**   Do you believe that to be the same project as the
9      project on the job list?
10            MS. BORYCA: Objection; lack of
11      foundation.
12   **Q.**   (BY MR. SOLLARS) You can answer.
13   **A.**   **Yes.**
14   **Q.**   Do you know if there were other ConAgra projects
15      performed by -- ConAgra parking garage projects
16      performed by Williams Restoration in 2014?
17   **A.**   **No.**
18   **Q.**   Do you know if this ConAgra parking garage project
19      continued after the sale of Williams to Fox Holdings?
20   **A.**   **I do not.**
21   **Q.**   Was it your ordinary course of business to maintain a
22      job list with the start dates and end dates of
23      projects?
24   **A.**   **No. That might have been something my secretary did**
25      **for her bookkeeping, but I wasn't aware of it.**

131

1   **Q.**   I'd like to refer you to an entry that's three down
2      back on Exhibit 4. It's titled CBF SLN 2-C project.
3   **A.**   **Yes.**
4   **Q.**   Do you recognize that project?
5   **A.**   **Yes.**
6   **Q.**   Could you describe what that is.
7   **A.**   **That's Google. It was an addition to the new Google**
8      **over in Council Bluffs.**
9   **Q.**   What is that? What type of project is it?
10   **A.**   **It was a tilt-up precast building. We did**
11      **fireproofing, sealants, stuff like that.**
12   **Q.**   Do you know approximately when that project began?
13   **A.**   **I believe it started towards the beginning of 2014, but**
14      **it continued on through after I sold the business.**
15   **Q.**   So you continued to do work, or at least Williams
16      Restoration continued to do work, on this project after
17      the sale?
18   **A.**   **Yes. We had a lot of it done, but it was a pretty**
19      **substantial size job.**
20   **Q.**   And then I would like to refer you back to Exhibit 24,
21      and would you mind flipping to page eight.
22   **A.**   **Okay.**
23   **Q.**   You'll see at the top of the page, it's titled Council
24      Bluffs Facilities SLN Super Cub, about I think it's the
25      sixth entry from the top of the page.

132

1   **A.**   **Yes.**
2   **Q.**   Again, with Seedorff Masonry?
3   **A.**   **Yes.**
4   **Q.**   Do you believe that to be the same project as the
5      project listed on the job list in Exhibit 4?
6            MS. BORYCA: Objection; lack of
7      foundation.
8            MS. OTT: Objection.
9   **Q.**   (BY MR. SOLLARS) You can answer.
10   **A.**   **Yes.**
11   **Q.**   And the five projects above the SLN Super Cub, are
12      those all related to the same Google project?
13   **A.**   **Yes.**
14            MS. OTT: Objection.
15            MS. BORYCA: Insert a foundation
16      objection for both of us.
17   **Q.**   (BY MR. SOLLARS) Let me back up. The SL2-C on the top
18      of the page, that is listed as a Seedorff Masonry
19      project?
20   **A.**   **Correct.**
21   **Q.**   And Seedorff Masonry was the general contractor; is
22      that correct?
23   **A.**   **They were the sub of the general contractor, yes.**
24   **Q.**   Who was the general contractor?
25   **A.**   **Whiting-Turner.**

**133**

1 Q. So going back to the job list on Exhibit 4, you listed
2      the general contractor as Seedorff Masonry again; is
3      that correct?
4 A. **Correct.**
5 Q. Do you know when that -- you testified that that
6      project continued after you sold the building; is that
7      correct?
8 A. **Business, correct.**
9 Q. The business, excuse me, correct. Thank you. I'd like
10      you to go back to Exhibit 4 again. If you go to page
11      two. On the first entry it's titled Block 68 Student
12      Housing. Do you recognize that project?
13 A. **Yes.**
14 Q. Could you describe what that is.
15 A. **It was below grade waterproofing.**
16 Q. And who was the general contractor on that project?
17 A. **It says Beal/Derkenne. I'm not sure exactly who it**
18      **was.**
19 Q. Were you familiar with this project?
20 A. **I was.**
21 Q. And the contract amount is $307,034; is that correct?
22 A. **Correct.**
23 Q. Would that have been a larger contract than normal for
24      Williams Restoration?
25 A. **Yes.**

**134**

1 Q. Do you know when that project began?
2 A. **It would have been early that year of '14.**
3 Q. Do you know when that project ended?
4 A. **I do not.**
5 Q. Do you know who the project owner for that project was?
6 A. **I do not.**
7 Q. I'd like to refer you back to Exhibit 24. Could you
8      flip to page five. About a third of the way down on
9      the page, there's a project entry called Block 68
10      Student Housing. Do you see that project?
11 A. **Yes.**
12 Q. And that project has Beal/Derkeen Construction LLC
13      listed as the general contractor; is that correct?
14 A. **Correct.**
15 Q. And that has a start date listed in the Fox Holdings
16      job list as November 13th, 2014. Is that after the
17      sale date of the business to Fox Holdings?
18 A. **Yes.**
19 Q. Do you believe that is the same project --
20 A. **It is the same project.**
21              MS. OTT: Objection; foundation.
22 Q. (BY MR. SOLLARS) You can answer the question.
23 A. **It is the same project.**
24 Q. Thank you.
25 A. **There was two portions of that. There was the below**

**135**

1      **grade waterproofing, which I was involved in. Then**
2      **after that they went to what they call an under slab**
3      **waterproofing, which would be an above grade, but it's**
4      **just a concrete -- before they put concrete over the**
5      **top of it, or pavers, they waterproof it. I know that**
6      **Fox Holdings did that portion of it.**
7 Q. So were there two contracts to that project, or was it
8      two different types of construction?
9 A. **There was one contract. That was just different scopes**
10      **of work.**
11 Q. But it began under Williams Restoration, and you
12      performed some work?
13 A. **Yes.**
14 Q. And the worked was finished by Fox Holdings; is that
15      correct?
16 A. **Correct.**
17 Q. Going back to Exhibit 4 again, about halfway down,
18      Council Bluffs Facility SLN2-E, do you see that
19      project?
20 A. **Yes.**
21 Q. And again, the general contractor was Whiting-Turner?
22 A. **Yes.**
23 Q. And the contract amount is 322,184?
24 A. **Yes.**
25 Q. And that appears to be the Google project again?

**136**

1 A. **Correct.**
2 Q. And is that a data center?
3 A. **Yes.**
4 Q. And it looks like you contracted directly with the
5      general contractor, Whiting-Turner?
6 A. **Yes.**
7 Q. Rather than being a sub for another contractor?
8 A. **Yes.**
9 Q. I'm going to, again, if you wouldn't mind flipping back
10      to Exhibit 24 again, and if you go to page eight. The
11      second entry down, it's a project titled Council Bluffs
12      Facilities SL2-D. Do you see that entry?
13 A. **Yes.**
14 Q. And the one below that is Council Bluffs Facilities
15      SL2-E, parentheses, WTC?
16 A. **Yes.**
17 Q. And that's listed as Whiting-Turner Contracting; is
18      that correct?
19 A. **Correct.**
20 Q. Were you familiar with that project?
21 A. **I was.**
22 Q. Could you describe that project for me.
23 A. **That was precast sealant and fire caulking.**
24 Q. Again, on the Google data center?
25 A. **Correct.**

**137**

1  **Q.**  Did you bid that project prior to the sale of Williams

2       Restoration?

3  **A.**  **Yes.**

4  **Q.**  Do you know when that project began?

5  **A.**  **I would say possibly in '13, even.**

6  **Q.**  Oh, really?

7  **A.**  **Yeah.**

8  **Q.**  Because of the length, the amount of the contract

9       amount, and the work performed --

10  **A.**  **Correct.**

11  **Q.**  -- that it took over a year, maybe two years to

12       perform?

13  **A.**  **At least a year.**

14  **Q.**  And so Williams Restoration began performance of that

15       contract; is that correct?

16  **A.**  **Correct.**

17  **Q.**  And then Fox Holdings completed that contract; is that

18       correct?

19  **A.**  **Correct.**

20  **Q.**  Okay. Thank you. Reviewing this job list, I see a lot

21       of entries with CBRE/Mega as the general contractor.

22       Who is CBRE/Mega?

23  **A.**  **They're a property management company.**

24  **Q.**  Did Williams Restoration perform a lot of work for

25       CBRE/Mega?

**138**

1  **A.**  **Yes.**

2  **Q.**  And what was your relationship with that company?

3  **A.**  **Meaning?**

4  **Q.**  Did you have an ongoing business relationship with

5       them?

6  **A.**  **We had no maintenance contract. They would call us.**

7       **We'd go out and bid. We mostly did sidewalks and**

8       **replaced concrete and stuff like that for them.**

9  **Q.**  Do you know if Fox Holdings continued that relationship

10       with CBRE/Mega?

11  **A.**  **I believe so.**

12  **Q.**  Like for example, on Exhibit 24, page nine, about a

13       quarter of the way down the page, Elwood Apartments,

14       parentheses, CBRE/Mega?

15  **A.**  **Elwood?**

16  **Q.**  Yes. Is that the same entity that we were just

17       discussing?

18  **A.**  **Yes.**

19  **Q.**  And do you know when that project was bid by Williams

20       Restoration?

21  **A.**  **I do not. I'm trying to think of what that is.**

22  **Q.**  And if you could go back to Exhibit 4, page five, about

23       halfway down the page.

24  **A.**  **Okay.**

25  **Q.**  Halfway down the page there's a project listed, Elmwood

**139**

1       Tower upper garage and deck.

2  **A.**  **Yes.**

3  **Q.**  The contractor is listed as Williams Restoration?

4  **A.**  **Yes.**

5  **Q.**  Do you know if that's the same project as the Elmwood

6       Apartments?

7  **A.**  **It is not.**

8  **Q.**  It is not?

9  **A.**  **No.**

10  **Q.**  Okay. Because that was directly contracted with

11       Williams Restoration rather than --

12  **A.**  **Correct.**

13  **Q.**  -- CBRE?

14  **A.**  **Yes.**

15  **Q.**  Another contractor that appears frequently is a company

16       called NGC Group?

17  **A.**  **Yes.**

18  **Q.**  Do you know who they are?

19  **A.**  **Yes.**

20  **Q.**  Who are they?

21  **A.**  **Called New Generation Construction out of Lincoln.**

22  **Q.**  Did Williams Restoration do routine work with them?

23  **A.**  **They were a new contractor. They built a lot of**

24       **hotels.**

25  **Q.**  I'd like to refer you to -- are you on page six of

**140**

1       Exhibit 4?

2  **A.**  **Yes.**

3  **Q.**  That's a project, Lincoln Airport Building 96.

4  **A.**  **Yes.**

5  **Q.**  And is NGC the contractor on that project?

6  **A.**  **I'm trying to find it here. How far down is it?**

7  **Q.**  It's about five, six entries from the top.

8  **A.**  **Okay. Yes.**

9  **Q.**  Do you recall any information on that project?

10  **A.**  **Yes.**

11  **Q.**  Do you know when that project was bid?

12  **A.**  **I do not.**

13  **Q.**  Do you recall that that project was bid prior to the

14       sale?

15  **A.**  **Yes.**

16  **Q.**  Do you recall if that project was performed prior to

17       the sale to Fox Holdings?

18  **A.**  **We were just getting started on it.**

19  **Q.**  Before the sale you were just getting started on it?

20  **A.**  **Correct.**

21  **Q.**  Do you know if it continued after the sale?

22  **A.**  **Yes.**

23  **Q.**  And was it completed by Fox Holdings?

24  **A.**  **Yes.**

25  **Q.**  And I would like to refer you back to Exhibit 24, page

141

1    13. Three entries from the bottom there's an entry
2    Lincoln Airport Building 96. Do you see that?
3  **A. Yes.**
4  **Q.** And is the general contractor on that project again NGC
5    Group?
6  **A. Yes.**
7  **Q.** And the job description on that indicates it's joint
8    sealing; is that correct?
9  **A. Correct.**
10 **Q.** Do you believe the project listed here, the Lincoln
11   Airport Building 96 is the same project that was listed
12   on the Williams Restoration job list?
13              MS. BORYCA: Objection; lack of
14   foundation.
15              MS. OTT: Same. You can go ahead and
16   answer.
17 **Q.** (BY MR. SOLLARS) You can answer.
18 **A. Yes.**
19 **Q.** I'd like for you to go to page seven of Exhibit 4.
20   Seven entries down, the UNO Community Facility Precast
21   project, do you see that one?
22 **A. Yes.**
23 **Q.** Are you familiar with that project?
24 **A. I am not.**
25 **Q.** You're not. Okay. The general contractor is listed as

142

1    Molin Concrete. Did you have any relationship with
2    that company?
3  **A. It doesn't ring a bell. It doesn't.**
4  **Q.** So you're not familiar with --
5  **A. I not familiar with it.**
6  **Q.** -- this project?
7  **A. That might have been Baxter Arena.**
8  **Q.** Baxter Arena?
9  **A. Yeah. For UNO. I didn't have anything to do with it.**
10 **Q.** Okay.
11 **A. Okay.**
12 **Q.** Two entries down, it's a project titled UNO Community
13   Arena?
14 **A. What page?**
15 **Q.** 24.
16              MS. OTT: What page of Exhibit 24?
17              MR. SOLLARS: It's page 24 of
18   Exhibit 24.
19              MS. OTT: I'm sorry.
20 **Q.** (BY MR. SOLLARS) There's an entry called UNO Community
21   Arena, Molin Concrete. Do you see that project?
22 **A. Yes.**
23 **Q.** And the general contractor is listed as Molin Concrete
24   Products Company; is that correct?
25 **A. Correct.**

143

1  **Q.** Does that project appear to be the same project as on
2    Exhibit 4?
3              MS. OTT: Objection; lack of foundation.
4              MS. BORYCA: Objection; lack of
5    foundation.
6              THE WITNESS: Yes.
7  **Q.** (BY MR. SOLLARS) There are also a number of Hy-Vee
8    projects, both gas stations and stores. Was Hy-Vee one
9    of your customers?
10 **A. Yes.**
11 **Q.** How long had that relationship with Hy-Vee existed
12   prior to the sale?
13 **A. Six years.**
14 **Q.** Do you know if Fox Holdings continued that relationship
15   with Hy-Vee?
16 **A. I do not.**
17 **Q.** Also, one of the contractors that appears frequently is
18   Seedorff Masonry. Did Williams Restoration work with
19   Seedorff on a regular basis?
20 **A. On the Council Bluffs project, yes.**
21 **Q.** And that was the Google project?
22 **A. Correct.**
23 **Q.** But that was the only project that you worked with
24   Seedorff?
25 **A. I believe so.**

144

1    (Recess taken at 2:29 p.m., and
2    deposition resumed at 2:36 p.m.)
3  **Q.** Refer you back to Exhibit 4 again. The nature of
4    Williams Restoration work, you had a lot of one-off
5    projects. Would that be an accurate description of the
6    type of work Williams did?
7  **A. Yes.**
8  **Q.** Meaning that you didn't consistently work with the same
9    general contractors over and over?
10 **A. Yes and no. It's a bid process, and you're not going**
11   **to get every bid.**
12 **Q.** Like, for example, project two on page one, the
13   Thompson Freezer Addition in Grand Island for Ultimate
14   Thermal.
15 **A. Yes.**
16 **Q.** Are you familiar with that project?
17 **A. Yes.**
18 **Q.** Could you describe what that was.
19 **A. That was polyurea joint fillers.**
20 **Q.** And the general contractor was Ultimate Thermal; is
21   that correct?
22 **A. Correct.**
23 **Q.** Did you ever work again for Ultimate Thermal?
24 **A. I don't know for sure.**
25 **Q.** How about the first one, the Beatrice Public Schools?

145

1  Are you familiar with that project?
2  **A.  Yes.**
3  **Q.**  Were you the estimator --
4  **A.  Yes.**
5  **Q.**  -- on that one?  And again, could you describe what you
6      did, what Williams Restoration did on that project.
7  **A.  We did a wall repair, re-tuck pointed it.**
8  **Q.**  And the project amount was only $2,365?
9  **A.  Correct.**
10 **Q.**  How long would that project have taken to perform?
11 **A.  Two days.**
12 **Q.**  And you didn't have a continuing relationship with the
13     Beatrice Public Schools?
14 **A.  No.**
15 **Q.**  Is that typical of what Williams Restoration was doing
16     prior to the sale?
17 **A.  Yes.**
18 **Q.**  I'm going to hand you -- I think we're up to 25.
19         (Exhibit 25 marked for identification)
20 **Q.**  I've handed you what we've marked as Exhibit 25.  Do
21     you recognize that document?
22 **A.  I've seen it before, yes.**
23 **Q.**  Do you know what it is?
24 **A.  No.**
25 **Q.**  You do not?

146

1  **A.  No.**
2  **Q.**  It's a remittance report dated December 2014.  Were you
3      ever familiar with these documents?
4  **A.  No.**
5  **Q.**  So Jean Stewart always prepared and executed these
6      documents?
7  **A.  Correct.**
8  **Q.**  And I'd like you to flip to the second page.  It's
9      identified BAC Funds 15.  It has nine -- actually eight
10     employees listed?
11 **A.  Correct.**
12 **Q.**  Are those the bricklayer employees that Williams
13     Restoration employed?
14 **A.  Correct.**
15 **Q.**  Are there any bricklayer employees missing from that
16     list?
17 **A.  Just my name.**
18 **Q.**  And why was your name not included on that list?
19 **A.  This report is dated 1-12-15.**
20 **Q.**  So that's after the sale?
21 **A.  Correct.**
22 **Q.**  And you were no longer working for Williams?
23 **A.  Correct.**
24 **Q.**  A couple of follow-up questions.  You
25     referenced in your earlier testimony there was an

147

1      addendum to the sale to revise the sale price.  What
2      happened there?
3  **A.  We came to an agreement that they said that I**
4      **overbilled on some things that we were -- we went by**
5      **percentages of completion on projects, and if they felt**
6      **that it was -- if it cost them more than what there was**
7      **left to bill to do the jobs, they assumed that there**
8      **was some overbilling done, so we went through that, and**
9      **we came up with a number, and both agreed on it.**
10 **Q.**  At the time of the sale did you have any outstanding
11     debt, or did Williams Restoration have any outstanding
12     debt?
13 **A.  Yes.**
14 **Q.**  What was that outstanding debt?
15 **A.  Mostly invoices.**
16 **Q.**  Invoices to suppliers?
17 **A.  Yes.**
18 **Q.**  Did you have any tax liability?
19 **A.  No, not that I was aware of at that time.**
20 **Q.**  And did you have any loans or any other type of
21     liability?
22 **A.  No.**
23 **Q.**  Did you tell any of your vendors of the sale to Fox
24     Holdings?
25 **A.  We sent letters out to everyone the day after the sale.**

148

1      **They came in on Monday, and my secretary sent letters**
2      **to everyone on Tuesday.**
3  **Q.**  Do you know if you sent any notifications to any
4      customers or general contractors of the sale?
5  **A.  Yes.**
6  **Q.**  Do you know if any customers or general contractors
7      canceled any bids or contracts?
8  **A.  Not that I'm aware of.**
9  **Q.**  Are you aware of any debts that weren't subject to the
10     sale, meaning did you pay down any debts of Williams
11     Restoration that Fox didn't assume?
12 **A.  No.**
13         MR. SOLLARS:  I think that's all the
14     questions I have.
15         REDIRECT EXAMINATION
16 BY MS. BORYCA:
17 **Q.**  I'm going to kind of harken back a couple of hours ago
18     and some questions Mr. Sollars asked you and kind of go
19     in that order.  Okay?
20 **A.  Okay.**
21 **Q.**  So I wrote down something you said.  I believe you said
22     that you don't think that they, and I think you were
23     referring to Sunbelt, really understood my business.
24 **A.  Yes.**
25 **Q.**  Do you believe that to be the case?