**Page 1**

```
09:50AM    IN THE UNITED STATES DISTRICT COURT
           FOR THE DISTRICT OF KANSAS

BAC LOCAL UNION 15 WELFARE  )   CASE NO. 2:16-CV-2242
FUND, et al.,               )
                            )
        Plaintiffs,         )
                            )   DEPOSITION
    vs.                     )
                            )
WILLIAMS RESTORATION COMPANY,)
INC., and FOX HOLDINGS, INC.,)
                            )
        Defendants.         )


        DEPOSITION OF LINDA D. ROBERSON
taken before Jean M. Schleife, Registered Professional
Reporter and General Notary Public in and for the State
of Nebraska, on January 10, 2018, and January 19, 2018,
at the law offices of Erickson Sederstrom, 10330 Regency
Parkway Drive, Suite 100, Omaha, Nebraska, taken on behalf
of plaintiffs, pursuant to the Federal Rules of Civil
Procedure and the within stipulations.




                        Jean M. Schleife, CSR
                   Matheson-Taulborg-Denney-Schleife
                        7602 Pacific Street
                        Omaha, Nebraska 68114
                   402/397-9669 - 402/680-3885
```

**Page 2**

```
                        APPEARANCES

Bradley J. Sollars
Suite 2001
1100 Main Street
Kansas City, Missouri 64105-5178
        On behalf of plaintiffs

Patrice D. Ott
Suite 800
1125 South 103rd Street
Omaha, Nebraska 68124-1079
        On behalf of defendant Williams Restoration

Bonnie M. Boryca
Suite 100
10330 Regency Parkway Drive
Omaha, Nebraska 68114
        On behalf of defendant Fox Holdings

Also present: Jordan Fox (January 10, 2018)
              Richard Roberson (January 19, 2018)


                        I N D E X
                                                Page
Direct examination by Mr. Sollars                 3
Cross-examination by Ms. Boryca                  71


                        EXHIBITS
No.                                           Identified
47      Affidavit                                 7
48      General contractors                      47
49      Omaha Southwest Iowa document            49
50      General contractors                      66
                       * * * * *
```

**Page 3**

(At 4:10 p.m. on January 10, 2018,

the deposition commenced as follows:)

LINDA D. ROBERSON

having been first duly sworn,

testified as follows:

DIRECT EXAMINATION

BY MR. SOLLARS:

Q. Good afternoon, Mrs. Roberson. Do you like to be called Ms. Roberson, Mrs. Roberson?

A. Linda.

Q. Linda? Fair enough. My name is Brad Sollars. I represent the plaintiffs in the matter. I'm going to be asking you some questions for 50 or so minutes and then might have to, as you discussed with your counsel, might have to continue in the next couple weeks.

A. Yes.

Q. Could you state your name for the record, please.

A. I'm Linda D. Roberson.

Q. Do you also sometimes go by Linda Fox?

A. My first, yes, my first married name was Fox, and upon selling real estate, I use the name Fox.

Q. Have you ever had your deposition taken before?

A. No.

Q. Just some quick rules. Jean here is going to be taking down everything you say. She's going to be

**Page 4**

transcribing it.

When I ask you a question, could you please say yes or no. No shakes of the heads, no nods, no uh-huh's, because it's hard to read when it comes up on the transcript.

A. Yes, sir. If I forget, remind me.

Q. Sure. And if you don't know a question that I've asked or don't understand it, ask me to rephrase it or repeat it, and I'll try to think of a way to make it more easy to understand.

A. Okay.

Q. Have you taken any medication or any other item that would prevent you from answering truthfully today?

A. Nothing that should be a problem, no.

Q. Are you taking any medication generally?

A. I take thyroid medication and sometimes methylphenidate for ADD.

Q. But you don't think any of those medications would affect your ability to answer these questions?

A. No, sir.

Q. What's your business address?

A. 725 North Frontier Road, Papillion.

Q. Who are you employed by?

A. I wouldn't exactly call me employed. I am not taking a salary. I'm probably a volunteer in a family business,

**Page 9**

A. We went in, Dickie and I went in to her and talked to her about a couple of businesses. One was an HVAC company, and another one was a restaurant type situation.

We met with somebody with the restaurant. She gave me the HVAC information. She said to me you probably won't want this particular company because it had organized labor.

Q. Did your contact ever give you any context of why that would not be advantageous to you?

A. Because she said to me, you -- she asked me if I had a background with organized labor, and I said no, and I said, I don't know enough about -- I agreed with her, I do not know enough about organized labor to take that on.

Q. And that HVAC company was provided to you by The Firm?

A. Yes, sir.

Q. And at what point did you go to Sunbelt?

A. Well, I got back on the Internet again and found what looked like a couple of companies that might fit, and I called Sunbelt and talked to Andrew Foxhoven.

Q. And what happened after you talked with Andrew Foxhoven?

A. We went in to meet him. Dickie and I went in the first time, and we talked about -- he asked us some

**Page 10**

information about what our experiences were and what we were interested in, and he gave us -- because we hadn't signed NDAs, the first contact was just I have probably three or four companies that you might be interested in, but you'll have to sign NDAs for me to give you the names and more information.

Q. Did you ask Sunbelt to solicit any businesses for sale, meaning did you ask Sunbelt to go out and inquire with any businesses?

A. No. I wouldn't have had that kind of experience to even think of that.

Q. It indicates on the last two lines of your affidavit that you remember specifically asking if Williams Restoration was a union company. Is that accurate?

A. Yes. On the second visit, after we had NDAs signed, he gave us three companies. One was a large HVAC company, one was a small HVAC company, and one of them was Williams Restoration.

Williams fit rather in the middle as far as expense and so on. And I said to him, I see that these are all construction companies.

And because of the background that I had with my first husband and so on, I said to him, are any of these a union shop, and he said no. I said, okay, then we'll proceed.

**Page 11**

Q. Was there a concern with Williams Restoration specifically being a union company?

A. Not any more than the other two. They were three companies sitting there, and with the marketing information that he gave us, no, I didn't have any concern.

I just know that construction can either be a union shop or a nonunion shop. I didn't know enough about that because of my previous experience with my first husband.

Q. Did your previous husband and your previous business, did it have any experiences directly with organized labor?

A. No. No. He started out in residential, which you typically do not see union companies, and when he moved into the commercial division, he just continued on the way he was.

He might have had experiences out and about because he was all on commercial jobs, but I didn't have that experience, because for the brief time that I actually worked down there, I was just in the office.

Q. Do you recall if any union attempted to organize Fox Custom --

A. Whatever it was.

Q. -- or the previous name?

**Page 12**

A. To my knowledge, no. I have no knowledge of that.

Q. So it sounds like Sunbelt gave you a name and then you went and visited the facility, Jeff Williams' facility?

A. Yes. After we looked over the information and decided that probably that one probably would be the easiest one for us to financially handle, they arranged for a meeting at the actual shop. So that was the first meeting with Jeff, as I recall.

Q. When you say financially handle, what do you mean by that?

A. Well, the one HVAC company, they were asking quite a bit more for that company than they were for Williams. And the other small one, actually, we looked at it, and I had an accountant that I knew look at all three of them, and he said, hey, with the small one, you're buying a job, what do you want this for. And he said with a large one, you're buying off probably too much financially.

He said, I would probably take a look at the one that's sitting in the middle, it looks more doable. So that's the main reason that we said okay, let's take a look at this one.

Q. And the large HVAC company, do you recall what the proposed purchase price of that company was?

A. It was three and a half million. I could be wrong, but

**13**

1      that's how I remember it.
2 **Q.** And Williams Restoration, what was the proposed
3      purchase price?
4 **A.** Two and a half, I believe.
5 **Q.** Two and a half million? Okay.
6 **A.** I could be off, but that's my memory.
7 **Q.** And when you first visited, Jeff indicated that there
8      may have been a couple or three union members at the
9      company. Is that accurate?
10 **A.** Not in our first meeting. We were down at the shop.
11      We didn't talk about any of that. He just showed us
12      the equipment and talked about the different companies
13      that he worked for, that he did work for, and he talked
14      about, you know, the equipment and the type of jobs
15      that they did, and I knew a lot of those construction
16      company names, so, you know, it kind of fit.
17 **Q.** So I guess after you visited the facility, you went
18      back to Sunbelt's offices after a couple days or
19      immediately?
20 **A.** I don't remember the exact amount, but it was fairly
21      shortly after that. We had a meeting at Sunbelt
22      with -- Andrew and Jordan and Dickie and I were there,
23      and Jeff was there.
24 **Q.** And that's when it was brought up that there may be
25      union members?

**14**

1 **A.** Well, because I know that commercial construction can
2      have a union contract with them, I said to him, I asked
3      him directly, because Andrew had told me no, I said
4      this is an open shop, this is not a union shop,
5      correct, you don't have a union contract?
6      And he said no, I do not, but I have two or three
7      members of the union working for me. And the reason I
8      remember this is because I didn't think that -- I
9      thought you were either union or nonunion.
10      So I looked at him and I said, how can this be, I
11      thought you either had to be a union shop or a nonunion
12      shop. And he said, oh no, it doesn't matter, I've just
13      got two or three guys working for me that are union
14      members, card-carrying members.
15 **Q.** So you knew enough at the time to recognize that you
16      either had a union contract --
17 **A.** I thought that, and he told me no. I'm sorry. I'm
18      interrupting.
19 **Q.** Let me finish my question. So you knew enough at this
20      time to know that a construction company had to either
21      be a union shop or a nonunion shop; is that correct?
22 **A.** No, I didn't know that for sure. That was my
23      assumption, that it had to be like that. And so that's
24      why I asked him, so this is a nonunion shop, correct?
25      And he said yes, I don't have a contract, I just have

**15**

1      two or three guys, maybe two or three guys working for
2      me that are union members.
3 **Q.** But that's what you say in your affidavit. Because in
4      my past experiences with my first husband's company,
5      you either had a union shop or a nonunion shop. So you
6      did know that --
7 **A.** Well, he talked like that, yes. I didn't have any
8      personal experience, so the only thing I had was what I
9      would have heard from my first husband. And that was
10      my understanding, that you had a union shop or a
11      nonunion shop.
12 **Q.** After that discussion with Mr. Williams and yourself,
13      did you ask anyone from Sunbelt about the contract
14      situation of Williams Restoration?
15 **A.** What contract are you referring to?
16 **Q.** Well, did you follow up with them regarding whether or
17      not Williams Restoration had a union contract after
18      hearing they had union members?
19 **A.** Andrew was sitting there and heard the whole thing, and
20      to my knowledge, he basically said, no, it wasn't union
21      also. And, you know, at that point the only -- the
22      follow-up that I did is I went to the Internet and
23      pulled up the Bricklayers. I pulled up the union
24      information, and Williams Restoration was not listed
25      there.

**16**

1 **Q.** Were there other contractors that were listed?
2 **A.** Yes, sir. Kehm was on there, Duffy. I think McGill
3      was on there. Some kind of Sparkle Water thing was on
4      there. It was called Sparkle Clean or something. I
5      don't know what it was. But there was no Williams
6      Restoration listed on there.
7 **Q.** And you went to the Local 15's website?
8 **A.** I went to Omaha, whatever the website was, Omaha's
9      website for the Bricklayers Union, yes. So we
10      proceeded.
11 **Q.** Did the contract issue, did that ever --
12 **A.** What contract issued?
13 **Q.** The union issue, did that ever give you pause to
14      consider walking away from the transaction?
15 **A.** No, not at that point.
16 **Q.** Why not?
17 **A.** Because he explained it to me enough that it seemed
18      logical. I didn't know enough about how unions
19      functioned.
20 **Q.** So next you signed a letter of intent with Sunbelt; is
21      that correct?
22 **A.** Yes. Then after that we signed a letter of intent to
23      proceed.
24 **Q.** And then your son testified that you financed a portion
25      of the purchase with a Small Business Administration

**Page 17**

 1  loan. Is that correct?
 2  A. Yes, that's accurate.
 3  Q. Do you know how much of the loan was financed through
 4     SBA?
 5  A. I believe it was the full 1.6 million.
 6  Q. Did you put any money down personally for the
 7     purchase --
 8  A. Yes.
 9  Q. How much money did you put down?
10  A. Roughly 700,000.
11  Q. How much, do you know, did Mr. Roberson put down?
12  A. That was us together.
13  Q. So seven hundred was both you and your husband?
14  A. Yes. It might have been seven fifty, because I don't
15     remember the exact amount now. This is three years
16     later.
17  Q. Sure.
18  A. But it was a good chunk.
19  Q. And after this meeting your testimony to the NLRB said
20     you had another meeting with Jeff Williams at Sunbelt
21     again, and he indicated that he had more like five or
22     six union members?
23          MS. BORYCA: What page are you on?
24          MR. SOLLARS: I'm on three.
25          THE WITNESS: Okay. Well, now time has

**Page 18**

 1  passed, and we've gone through the business appraisal.
 2  Okay? And we've gone through all the other expenses
 3  and work on purchasing this company.
 4       And not too long before closing we had another
 5  meeting with Jeff, because we had to also finalize
 6  lease information and those other sorts of documents
 7  that were going to be included in the closing, also the
 8  transitional document and so on.
 9       So yes, we met with him, it must have been a week
10  and a half, two weeks before we were supposed to close.
11  I don't remember the exact date. Maybe less. But I do
12  remember the meeting.
13  Q. (BY MR. SOLLARS) And then I'm back on page three again
14     of your affidavit, and you testified that the closing
15     was pushed back, and you stated Jeff's attorney wanted
16     to look at the contract one more time. Do you know
17     what the reason was?
18  A. Because I believe Jeff hadn't shown him the contract
19     yet, but I'm speculating.
20  Q. Are we talking about the --
21  A. His attorney. We had made the negotiations.
22  Q. So we're talking about the asset purchase agreement?
23  A. Yes, sir. And at that particular meeting that you were
24     asking me about, because of not understanding how
25     organized labor works and being a little bit still -- I

**Page 19**

 1  said to him, so you do not have a union contract,
 2  correct? And he said, correct, but I might have five
 3  or six guys working for me that are card-carrying
 4  members, that are union members. And he clearly stated
 5  he did not have a contract whatsoever.
 6  Q. Did Mr. Williams ever discuss with you his membership
 7     in the Bricklayers Union?
 8  A. Absolutely not.
 9  Q. Did he ever discuss with you his plans after selling
10     the business?
11  A. Yes. I asked him about retirement, and I said, you're
12     kind of young to -- off the cuff, I remember saying
13     something about you're kind of young to retire.
14       He says, well, you know, I'm moving into other
15     ventures and so on. And he had something about some
16     property he owned and he was doing some other things.
17  Q. Did Mr. Williams ever talk to you about his pension
18     benefits?
19  A. Absolutely not.
20  Q. So on November 7th you guys signed the closing
21     contract, the asset purchase agreement; is that
22     correct?
23  A. Dickie and Jordan did, yes.
24  Q. And you were not a party to that agreement?
25  A. No. Not an official person, no.

**Page 20**

 1  Q. And you went to work at Williams Restoration on the
 2     10th?
 3  A. Yes. I was there the morning of the 10th. The brokers
 4     told us that that would be the best way to do it.
 5  Q. I'm going to skip ahead a little bit. I'm going to
 6     come back to this issue, the contract issue, in a
 7     second. I just want to get some other stuff, because I
 8     think that's going to take some time, so I just want to
 9     get some other information.
10  A. Okay.
11  Q. So you met with the employees on November 10th?
12  A. Yes. That was the first we met any of them.
13  Q. So Doug Tiefenthaler and Tyler Patterson were the two
14     superintendents of Williams; is that correct?
15  A. Yes. That's what Jeff said, and that's how he
16     introduced them.
17  Q. And Doug Tiefenthaler was a Local 15 member, but Tyler
18     Patterson was not. Is that your understanding?
19          MS. BORYCA: Objection; lack of
20     foundation. Now you can do your best to answer the
21     question.
22          THE WITNESS: I had no idea whether Doug
23     was in the union or not. How would I have known that?
24  Q. (BY MR. SOLLARS) When you came on November 10th, you
25     didn't know whether --

21

1 **A.** I did not.
2 **Q.** And did you know whether Tyler Patterson was a member
3   of Local 15?
4 **A.** No, I did not.
5 **Q.** So you testified to the NLRB, quote, and it appears you
6   were --
7   MS. BORYCA: What page?
8   MR. SOLLARS: On page four.
9 **Q.** (BY MR. SOLLARS) It appears you were talking to Tyler
10  Patterson, and you stated to him, quote, you do not
11  have to have any fear that we will disrupt your life.
12  Was that accurate?
13 **A.** Yes. He looked like somebody had punched him, because
14  he had no idea that there was ownership changing,
15  obviously.
16  And I felt bad for him, so I just kind of touched
17  his arm, and I said, Tyler, it's going to be okay, you
18  know, we're not here to cause any problems, we're not
19  here to make any changes.
20  The SBA people had told us don't make any changes
21  for at least six months, and so I was trying to
22  reassure him.
23 **Q.** And you said the same thing to Doug Tiefenthaler?
24 **A.** I did. And Doug seemed more casual about it.
25 **Q.** But you made the representation to Doug as well that

22

1  you wouldn't disrupt his life?
2 **A.** I wasn't planning on it. To the best of my knowledge,
3   I wouldn't have been disrupting his life.
4 **Q.** I'm going to move to page five, the first paragraph.
5   It states on the first morning you were there, you
6   testified that we had a couple of employees asking what
7   we were going to do about the fact that they were union
8   members and were we going to sign a contract. What was
9   your interpretation of those statements to you?
10 **A.** What do you mean my interpretation?
11 **Q.** Was that the first time that you had found out that
12  there were union members in the company?
13 **A.** No. Jeff had said he had about five or six that had
14  memberships.
15 **Q.** So in terms of their questions about signing a
16  contract, what was your response to that?
17 **A.** My response was -- well, actually, I was surprised,
18  because I knew that we didn't have a contract, and I
19  thought Jeff did not have a contract.
20  So basically they were asking when Jordan was also
21  around, and Jordan rather handled it. We told them not
22  to worry about things and we'd try to find benefits and
23  move forward and do the best that we could do. You
24  know, I didn't know anything about signing any
25  contracts.

23

1 **Q.** So how did the fact that these people, these employees,
2   were saying that they were union members reconcile with
3   your previously testified belief regarding that you're
4   either a nonunion shop or a union shop? How did you
5   reconcile that you had union members here but then --
6   MS. BORYCA: I'm going to object to the
7   form of the question, also lack of foundation to the
8   extent it may be asking for like a legal opinion or
9   legal conclusion. You can --
10  THE WITNESS: How I justified it was is
11  because Mr. Williams told me, because I don't have an
12  extensive background in organized labor, and Mr.
13  Williams and Sunbelt reassured me there was not a union
14  contract, and Jeff said, you can have union members
15  working here but you don't have to have a contract.
16 **Q.** (BY MR. SOLLARS) Did you ever obtain legal advice on
17  that issue?
18 **A.** The counsel and so on and so forth said it wasn't an
19  issue --
20  MS. BORYCA: Hold on, Linda. I don't
21  want you to communicate anything you might have learned
22  from your attorneys, but you can answer his question
23  yes or no, did you confer with legal counsel on that
24  issue.
25 **Q.** (BY MR. SOLLARS) I'll strike that and just restate the

24

1   question. Yes or no, did you obtain legal counsel on
2   the union contract issue?
3   MS. BORYCA: And do you mean at the
4   timeframe we're looking at on page five of the
5   affidavit?
6   THE WITNESS: First of all, before --
7   MS. BORYCA: Hold on. Let's get his
8   question straight --
9   THE WITNESS: Okay. Sorry.
10  MS. BORYCA: -- so just wait, and I'll
11  tell you when you can answer.
12 **Q.** (BY MR. SOLLARS) When you were first informed that
13  Williams Restoration had union members, did you ask,
14  yes or no, for advice from legal counsel?
15  MS. BORYCA: So that would be
16  pre-closing?
17  MR. SOLLARS: Pre-closing.
18  MS. BORYCA: Okay.
19 **Q.** (BY MR. SOLLARS) When you first learned of the
20  possibility of union employees being employed.
21  MS. BORYCA: The question is, did you
22  consult with an attorney on that issue?
23  MR. SOLLARS: Yes.
24  THE WITNESS: No, not at that point. I
25  believed him.

January 10 and 19, 2018  Linda Roberson  BAC Local 15, et al., v. Williams, et al.

7 of 28 sheets

## Page 25

1  Q. (BY MR. SOLLARS) At what point did you consult with
2  legal counsel about the union contract issue?
3  A. Well, because I didn't know that there was a contract,
4  I didn't really ask anybody about if there -- about
5  union contracts specifically. You know, I can't ask
6  about something I don't know anything about.
7  Q. So at what point did you get legal advice about the
8  union membership issue?
9  A. Probably about that same -- about that same time that I
10  found out there were five or six, probably after that,
11  if I remember right. And basically I was told --
12       MS. BORYCA: Wait. I don't want you to
13  say what you were told, but I think you've answered his
14  question.
15  Q. (BY MR. SOLLARS) So prior to closing you solicited
16  legal advice about the union employees of Williams
17  Restoration; is that correct?
18  A. Yes. I also have a background in -- because of my real
19  estate, I also know that if there's not a contract in
20  the documents, in the purchase agreement, as an
21  addendum or specifically stated and given to the buyers
22  at the time, that that is illegal.
23       So I was not that concerned, because there was no
24  contract that was signed and put in with the closing
25  docs. That's fraud.

## Page 26

1       And I remember telling Dickie and Jordan,
2  contractual law says if there's actually a contract, it
3  would have to be included with the closing docs, just
4  as the lease was included, just as all the other,
5  buy-sell agreements and everything else, anything
6  that's a liability has to be put into the contract.
7  And our contract stated we were not taking on any
8  liabilities.
9  Q. I want to go back to that first morning when you
10  were -- I think it's November 10th, 2014, where you
11  first went to the facility. At that time was it your
12  intent to offer health insurance benefits to any
13  employees?
14  A. I don't know if I thought of that right that second
15  that morning, but yes, I would have liked to have
16  offered that to the employees. I care about people.
17  Q. Did you offer that to the employees?
18  A. Not right at that point. If I remember right, when we
19  put the memo on their checks, their first checks that
20  were coming from us, we were going to talk to them
21  about salaries and benefits.
22  Q. And you stated one of them asked about the 401(k)'s.
23  Was there only an employee asking about 401(k)'s, or
24  were any employees asking about their pension benefits?
25  A. Nobody said anything about a pension benefit. They

## Page 27

1  asked me about a 401(k). And we did get an IRA in
2  place as quickly as we could, which was by about -- I
3  think it was the first part of March.
4  Q. So no one discussed their pension benefits with you?
5  A. No, not that I recall. I didn't know anything about
6  pension benefits.
7  Q. In your opinion is a 401(k) the same as a pension
8  benefit?
9  A. I have no idea, because I've never had a pension
10  benefit from an organized labor union.
11  Q. Earlier you testified that your husband currently
12  receives a pension benefit. Is that the same as a
13  401(k)?
14       MS. BORYCA: Objection; form of the
15  question.
16  Q. (BY MR. SOLLARS) You can answer.
17  A. I have no idea if his is like that. That was all set
18  up before --
19  Q. That's fine. Thank you.
20  A. Actually, it probably isn't.
21  Q. Moving on to the first Friday, you testified when the
22  first payment came out on November 21st, 2014, you
23  testified to the NLRB that Doug Tiefenthaler ran into
24  your office and questioned you about union dues. Do
25  you remember that conversation?

## Page 28

1  A. I sure do.
2  Q. What was the extent of that conversation?
3  A. He ran into the office that I was sitting in and said,
4  you didn't take any dues out of my check, and he said,
5  if you don't take the dues out of my check, I'm not
6  going to have any health insurance.
7       And I said, what do you mean you're not going to
8  have any health insurance? And he said, I won't have
9  any health insurance. And I said, do you mean right
10  now? And he said, yes, right now. If I pick up -- and
11  I said, well, we don't have a contract to pay those
12  benefits. And he says, I will have no insurance. He
13  says, all of us will have no insurance.
14       And so yeah, that concerned me, because I did not
15  want -- it wasn't their fault we bought the company,
16  and I did not want those particular men that thought
17  they had insurance to go without insurance over the
18  period. It would devastate them if they had a
19  catastrophe or like a heart attack or an accident.
20  Q. Let me back up a second. You were using Paychex to pay
21  the paychecks and do payroll; is that correct?
22  A. Yes. I didn't deal with Paychex directly myself.
23  Q. What payroll company was Williams Restoration using
24  prior to the sale? Do you know?
25  A. I don't know for sure. Jean handled most of that.

**29**

1 Q. But was it Paychex?
2 A. I can only speculate that it was. I don't know for
3     sure, because I didn't see any of Jeff's paperwork.
4 Q. In terms of the dues, did you or your husband or Jordan
5     instruct Paychex not to withhold union dues?
6 A. No, sir. I instructed -- I think it was me instructed
7     Jean. She handled all the paperwork.
8 Q. So you instructed Jean not to pay the union dues or
9     withhold union dues?
10 A. Yes.
11 Q. So how would you have known to withhold union dues if
12     you didn't know there was a contract in place?
13 A. Because they were -- there wasn't a contract in place
14     that I knew of. It had nothing to do with that. We
15     were told that those four or five members had -- they
16     were card-carrying members of the union, and we were
17     instructed to renegotiate salaries and start over
18     because we were a new company.
19 Q. But again, how did you know about the union --
20 A. Because they were talking about it that first week. I
21     didn't know anything about it until I walked in on
22     November 10th. All of them were concerned. There's a
23     change in the company, and nobody told them, and what
24     was going on happen.
25 Q. Again, were you concerned that if they didn't have a

**30**

1     contract, union dues were being taken out?
2 A. I didn't know what the rules were. I do not know
3     anything about how organized labor works.
4 Q. And again, did you seek legal counsel on that issue at
5     this time?
6 A. Yes.
7 Q. And your legal counsel at this time was Chuck
8     Sederstrom; is that correct?
9 A. Yes. And we did talk to Mark Schorr once.
10 Q. You testified that Mr. Tiefenthaler ran into your
11     office. Did any other employees talk to you about the
12     union dues issue or the benefit issue on November 21st?
13 A. To my knowledge it was only Doug. He ran in at the
14     very end of the day. And so I was concerned that
15     people couldn't go out -- I was concerned about them
16     not having insurance. Later on I found out it wasn't
17     true, but at the time I thought it was.
18 Q. So Doug brought up health insurance, and you, in your
19     testimony to NLRB on pages five and six, stated that
20     you were concerned that if someone didn't have health
21     insurance and had an accident, it could be devastating;
22     is that correct?
23 A. Yes, the ones who had insurance.
24 Q. What about the people that didn't have insurance?
25 A. The company did not -- at the time that we bought it,

**31**

1     the company did not offer any insurance to those
2     people. They either had their own or didn't have any.
3     I wasn't aware of those facts.
4 Q. You weren't aware that the company didn't offer health
5     insurance to all employees?
6 A. Not really. Not until after I got in there.
7 Q. Was that something that you inquired to Sunbelt about?
8 A. No. Didn't think of it.
9 Q. Would you have been concerned that the company was not
10     offering health insurance prior to the sale if you knew
11     that?
12 A. Probably. I don't know. I wasn't thinking along those
13     lines.
14 Q. What lines were you thinking along?
15 A. I don't know.
16 Q. So did you offer to make health insurance available to
17     the employees that didn't have health insurance?
18 A. I told all of them we would do what we could to
19     research it and find out what we could offer. They
20     were all treated equally as best as we could.
21 Q. So moving on to November 24th, you testified to the
22     NLRB that you had instructed Jean Stewart that you
23     would have to continue with benefits until insurance
24     was established; is that correct?
25 A. That's correct. That was -- she was -- she wasn't

**32**

1     there on Friday, so on Monday morning I went to her
2     directly and said, we need to go ahead and keep paying
3     their benefits because I cannot have these men that
4     think they have insurance not have any health
5     insurance.
6 Q. How many of your employees currently have health
7     insurance?
8 A. Well, because of the Affordable Care Act, we took
9     surveys, and you have to have a 75 percent
10     participation rate, and we cannot get that. We tried
11     twice.
12 Q. You tried twice. When did you --
13 A. I believe it was twice.
14 Q. When did you survey the employees, if you can recall?
15 A. When I finally got ahold of Shawn Larson, he really
16     stepped in and tried to help, and I explained the
17     situation to him, and he said, well, we'll have to find
18     out who wants it and so on and so forth.
19         So I took surveys. You should have documents of
20     those surveys that we took. I believe I gave them to
21     Mark.
22 Q. So you gave those survey results to your counsel?
23 A. I gave them to the NLRB to begin with.
24 Q. Do you know if you retained the results of those?
25 A. I have those. I think I could find those, yes.

**Page 53**

1 my remembering.
2 **Q.** Were there any liens that you're aware of of Williams
3 Restoration that were discussed?
4 **A. Not at this time, no.**
5 **Q.** So you received this asset purchase agreement, and then
6 I think there's been testimony that there was a change
7 between this draft and the final draft that was
8 eventually signed.
9 Did you have any involvement in the negotiation or
10 revisions to the asset purchase agreement between this
11 version and the final version?
12 **A. No. Jordan discussed it with me a little bit, but no,**
13 **I had no negotiating or changes that I made.**
14 **Q.** And I'm going to put what we've marked as Exhibit 14.
15 Take a look at that, if you'd like.
16 **A. Okay.**
17 MS. BORYCA: Just wait for him to ask
18 you a question.
19 **Q.** (BY MR. SOLLARS) So are you familiar with this
20 document?
21 **A. Yes, I've seen it before.**
22 **Q.** Did you review it prior to Mr. Fox signing it?
23 **A. I skimmed over it. Again, I let him take the lead on**
24 **most of this.**
25 **Q.** I'd like to ask you to turn again to page seven,

**Page 54**

1 section 3.10.
2 **A. Okay.**
3 **Q.** Did you ever review this section with Mr. Fox or
4 Sunbelt or with Williams?
5 **A. Only with Jordan. He discussed it with me a little**
6 **bit.**
7 **Q.** And what were your discussions with Jordan?
8 **A. That they had changed this to had been a party to a**
9 **union contract. And we talked about the fact that it**
10 **was in past tense and that the other parts of the**
11 **contract had said it was an asset purchase and we were**
12 **not taking on other liabilities, including absences of**
13 **undisclosed liabilities.**
14 **And then at that point I reiterated to him that I**
15 **had some background in contractual law and because the**
16 **purchase agreement did not say that there was a present**
17 **contract and/or any liabilities being transferred in**
18 **relation to a union contract, and if they're not in the**
19 **closing docs, they're not there.**
20 **Q.** And you just testified that it states that -- I'll
21 state the provision that you're referring to. Quote,
22 seller employs and has employed union employees,
23 specifically bricklayer union members, and has been a
24 party to the overall union contract, period, end quote.
25 **A. Yes.**

**Page 55**

1 **Q.** So it does say has been, not had been; is that correct?
2 **A. Has been. That's past tense.**
3 **Q.** So your interpretation of has been, that is past tense?
4 **A. Yes.**
5 **Q.** So if it was past tense, why wasn't it was? Why wasn't
6 the phrase was party?
7 MS. BORYCA: Objection; lack of
8 foundation, form of the question. You can still
9 answer.
10 THE WITNESS: Not a grammar expert.
11 Past tense.
12 **Q.** (BY MR. SOLLARS) So again, you believe has been is
13 past tense?
14 MS. BORYCA: Objection; asked and
15 answered.
16 MR. SOLLARS: I'm just clarifying that.
17 **Q.** (BY MR. SOLLARS) You can answer.
18 **A. Yes, sir.**
19 **Q.** And what's your background in contractual law?
20 **A. Only that I sell real estate. I was a real estate**
21 **agent, and so I've had contracts going through my hands**
22 **before.**
23 **Q.** And you indicated that you were advised that if there
24 was not a reference in the excluded assets or contracts
25 provision, that that meant that no contracts or

**Page 56**

1 liabilities would transfer from Williams Restoration to
2 Fox Holdings?
3 MS. BORYCA: Hold on a second. Is your
4 question did you testify that you were advised?
5 MR. SOLLARS: Yes.
6 MS. BORYCA: Okay. I think that
7 misstates her testimony. Objection; form of the
8 question.
9 To the extent he's asking you whether you were
10 advised by legal counsel, you're not going to tell him
11 anything that you've had discussions with legal counsel
12 about. I don't know if that's what he's really asking,
13 but --
14 **Q.** (BY MR. SOLLARS) I'd like to back up to your statement
15 earlier regarding this provision. You said that it was
16 your understanding that unless a provision was
17 specifically referenced in the asset purchase agreement
18 and that it was not -- unless it was specifically
19 referenced, it would not transfer to Fox Holdings; is
20 that correct?
21 MS. BORYCA: Objection; again misstating
22 her testimony. You can ask her, I mean, the question
23 if you want to ask her what she said earlier, or we can
24 have it reread, but I think you're misstating it.
25 MR. SOLLARS: Jean, would you mind

**Page 57**

 1  reading her testimony.
 2            MS. BORYCA: If we can find it.
 3      (The requested portion of the testimony
 4      was read back by the court reporter)
 5  Q. (BY MR. SOLLARS) Okay. So based on your previous
 6     testimony, let me get this straight, you believe that
 7     since the union contract was not specifically
 8     referenced in the asset purchase agreement or the
 9     closing documents that you do not believe that the
10     contract transferred to Fox Holdings; is that correct?
11  A. **I didn't know there was a contract to transfer. I**
12     **didn't believe there was one.**
13  Q. But, and to reiterate, even if you knew there was one,
14     since it was not referenced in the asset purchase
15     agreement or the closing documents, you would not
16     believe that it would transfer anyway; is that correct?
17            MS. BORYCA: Objection; calls for a
18     legal conclusion and speculation, so form of the
19     question. You may still answer, Linda.
20            THE WITNESS: My understanding, that if
21     you are passing on any liabilities from the seller to a
22     buyer, it must be disclosed, and if it is not
23     disclosed, that is illegal.
24  Q. (BY MR. SOLLARS) I'm going to hand you back
25     Exhibit 13. Have you seen that document before?

**Page 58**

 1  A. **This?**
 2  Q. Yes.
 3  A. **No. Are you talking about just the first page?**
 4  Q. Yes.
 5  A. **No.**
 6  Q. You haven't. Were you privy to any emails between Mr.
 7     Roberson, Mr. Fox or Sunbelt?
 8  A. **No. They were emailing Jordan.**
 9  Q. So you haven't seen that email before?
10  A. **No.**
11  Q. And you don't have any access to the rrhand1@aol.com
12     email address?
13  A. **No.**
14  Q. And that's Mr. Roberson's email address?
15  A. **Yes, sir.**
16  Q. Did Mr. Fox or Mr. Roberson ever discuss that Jeff
17     Williams provided an email with a copy of a union
18     contract?
19  A. **No. A boilerplate. Jordan told me that he had**
20     **received a boilerplate general contract that was**
21     **unsigned and unlabeled.**
22  Q. And did you discuss that with Jordan?
23  A. **Only that it's not signed. Mr. Williams continued to**
24     **say he had never signed a contract, and so therefore**
25     **they couldn't come up with one.**

**Page 59**

 1  Q. Did you ever reach out to Local 1 or Local 15 after
 2     receiving the knowledge of the boilerplate contract, as
 3     you call it?
 4  A. **No.**
 5  Q. I'm going to hand you what we've marked as Exhibit 23.
 6     You can take a look at that real quick. Have you ever
 7     seen that document before?
 8  A. **No.**
 9  Q. Or the email?
10  A. **Oh, the document? Let me look. I have not seen the**
11     **email.**
12  Q. So you had not?
13  A. **No.**
14  Q. Did Mr. Roberson ever discuss contacting Jared Skaff?
15  A. **No.**
16  Q. Do you know if Mr. Roberson ever contacted Jared Skaff?
17  A. **No.**
18  Q. I'd like to refer you back to 14 again.
19  A. **Exhibit 14?**
20  Q. Exhibit 14, yeah. I'd like you to flip to pages three
21     and four.
22  A. **Okay.**
23  Q. Section 1.4.
24  A. **Okay.**
25  Q. Were you familiar with that provision in the asset

**Page 60**

 1     purchase agreement?
 2  A. **Not in detail. Just that the liabilities were**
 3     **excluded.**
 4  Q. Was there ever a discussion of excluding the union
 5     contract in this provision?
 6  A. **Not that I'm aware of. I didn't know there was a union**
 7     **contract.**
 8  Q. Do you know, to your knowledge, were there any
 9     liabilities that were added to this agreement at Fox
10     Holdings' request or Jordan Fox's request?
11  A. **I only remember Jordan discussing something about a --**
12     **I think it was the ADT -- an ADT contract and some of**
13     **their small advertising contract, and he was fine with**
14     **that.**
15  Q. You can refer back to Exhibit 20, if you want to. Did
16     you ever question or do you know what the basis was to
17     the change to section 1.2, the excluded assets
18     provision in Exhibit 20, versus the excluded asset
19     provision in the final contract?
20            MS. BORYCA: Objection; lack of
21     foundation.
22            THE WITNESS: I don't recall that.
23  Q. (BY MR. SOLLARS) So you don't recall discussions of
24     including more excluded liabilities between the draft
25     asset purchase agreement and the final asset purchase

**Page 73**

STATE OF NEBRASKA )
:ss
COUNTY OF DOUGLAS )

I, LINDA D. ROBERSON, do hereby attest that I have read the foregoing deposition and find it to be true and correct, with the exception of any changes that I have noted below:

| PAGE | LINE | CHANGE | REASON FOR CHANGE |
|---|---|---|---|
| 60 | 12,13 | of other | wrong words |
| | 12-17 | biting | wrong word |
| 13 | 20 | of time | omission |
| 21 | -14 | an ownership - change | wrong wording |
| 29- | 24 | - to - | wrong word |

_Linda D. Roberson_
Signature of Deponent

Subscribed and sworn to before me this __30__ day of __January__, 2018.

_[signature]_
GENERAL NOTARY PUBLIC

**Page 74**

CERTIFICATE

STATE OF NEBRASKA )
:ss
COUNTY OF DOUGLAS )

I, Jean M. Schleife, General Notary Public in and for the State of Nebraska, do hereby certify that LINDA D. ROBERSON was by me duly sworn to testify the truth, the whole truth, and nothing but the truth, and that the deposition as hereinbefore set forth was reduced to writing by me;

That the within and foregoing deposition was taken by me at the time and place herein specified and in accordance with the within stipulations, the reading and signing of the witness to the deposition having not been waived;

That I am not counsel, attorney or relative of any of the parties or otherwise interested in the event of this suit.

IN TESTIMONY WHEREOF, I have placed my hand and notarial seal this _____ day of January, 2018.

_____
General Notary Public

**Page 75**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

BAC LOCAL UNION 15 WELFARE FUND, et al.,
    Plaintiffs,
vs.
WILLIAMS RESTORATION COMPANY, INC., and FOX HOLDINGS, INC.,
    Defendants.

CASE NO. 2:16-CV-2242

COST CERTIFICATE

CERTIFICATE OF DEPOSITION OF LINDA D. ROBERSON

Taken on behalf of plaintiff

Date: January 10 and 19, 2018

The original deposition is in the possession of:

Bradley J. Sollars
Suite 2001
1100 Main Street
Kansas City, Missouri 64105-5178

Costs: $_____, taxed to plaintiff.

_____
Jean M. Schleife
General Notary Public

GENERAL NOTARY-State of Nebraska
DOUGLAS W RITCHIE
My Comm. Exp. May 24, 2021