										Fox Holdings, Inc. dba Williams Restoration
										Company
										Case 14-CA-152037 and 153558

## Confidential Witness Affidavit

**I, Jordan Fox, being first duly sworn upon my oath, state as follows:**

**I have been given assurances by an agent of the National Labor Relations Board (NLRB) that this Confidential Witness Affidavit will be considered a confidential law enforcement record by the NLRB and will not be disclosed unless it becomes necessary to produce this Confidential Witness Affidavit in connection with a formal proceeding.**

My mailing address is 725 N. Frontier Road, Papillion, Nebraska 68046.

My office telephone number (including area code) is (402)597-1200.

My e-mail address is Jordan@wrc.omhcoxmail.com

      I am the President of Fox Holdings, Inc. (Fox Holdings). Fox Holdings was created in mid-September 2014, around September 16. The principal officers of the company include myself as President and Richard Roberson as Vice President and Secretary. Linda Roberson is highly involved but she is not legally one of the officers listed on the articles of incorporation.

      We were in the market to purchase a business and we did internet searches and also contacted business brokers. In that process, we ended up talking to Sunbelt, and I don't know their full name, but they are business brokers. I think it was in early or mid-August 2014, that we first talked to Sunbelt. I was not involved in the initial discussions with Sunbelt when we went in to find a business. That was Linda and Richard. They went to the initial meetings to discuss business searches. They talked to multiple brokers, but from Sunbelt, they provided three or four different companies to us to look at. High level general information about companies until we signed non-disclosure agreements. Once we got the paperwork, I started reading through the paperwork and had discussions with my parents. At that point in time,

- 1 -                                                          Initials: JF

EXHIBIT 26  1-10-18

CONFIDENTIAL    Fox 0047

1   Williams Restoration was one of the companies we had high level information/details. I wasn't
2   at the meeting but I do know we were explicitly looking for non-union companies and when we
3   went to Sunbelt, and I can't remember the other companies we spoke with off the top of my
4   head, we told them we were looking for non-union companies, so they presumably provided us
5   with information for non-union companies. We then signed non-disclosure agreements to get
6   further information on three companies, Williams Restoration included. At which point, we got
7   more information including some more detailed financial information. My parents and I asked
8   advice from friends as to what to look for when purchasing a business. We looked through the
9   information that was provided to us by the brokers. We narrowed it down to Williams
10  Restoration in late August or early September 2014. We then signed non-disclosure agreements
11  to get further information on three companies, Williams Restoration included. At which point,
12  we got more information including some more detailed financial information. My parents and I
13  asked advice from friends as to what to look for when purchasing a business. We looked through
14  the information that was provided to us by the brokers. We narrowed it down to Williams
15  Restoration in late August or early September 2014. It was before we incorporated. Once we
16  had solidified, we had a meeting with Sunbelt to discuss the company. I don't recall being at that
17  meeting. Linda and Richard would have been present for Fox Holdings. We then discussed with
18  Sunbelt meeting the seller, Jeff Williams, on the property. We arranged the meeting. It would
19  have been late August or early September 2014. We came to the Williams Restoration property
20  at around 5 p.m. after the work day. Members present were myself, Linda, Dickey, Andrew
21  Foxhoven (Sunbelt representative), and Jeff. At that meeting, there was no discussion about a
22  union or union contract. We only discussed the nature of the business, the building and the
23  equipment. At this point in time, there had been no discussions other that we were looking for a

CONFIDENTIAL        Fox 0048

1  non-union company with the business broker. At this point, none of the paperwork from Sunbelt

2  explicitly stated that the company was a union or non-union company. I have provided copies of

3  the marketing information that was provided to us by Sunbelt. Most of the information that

4  came after the initial marketing materials was either verbal or related to financial information.

5  There was no other information provided in writing other than financial information until we

6  started negotiations.

7  After meeting with Jeff, my parents and I had further discussions on whether or not we

8  wanted to pursue Williams Restoration. We had more conversations with the business broker

9  and asked for more updated financial information. At some point in early September 2014, we

10 all sat around a table and had the go/no-go meeting. We decided to go after Williams

11 Restoration and we started talking to advisors. We got accountants and attorneys involved. We

12 had them look over information that we have been provided. We spoke with them. The

13 financials looked good. The information we had been provided looked good and we decided to

14 go ahead and incorporate and begin negotiations to purchase some of the assets of Williams

15 Restoration Company. We did not buy everything that Jeff had.

16 We had all of our meetings with the advisors. We contacted the Small Business

17 Administration. It was a Wells Fargo Banker who does their SBA loans, Eric Ludal. We

18 contacted him before we incorporated to see if it was feasible to get a loan. He was one of our

19 advisors. We gave the financial information to our accountant and to Eric. We began the

20 process through Wells Fargo to get a loan to purchase the company. We incorporated. We also

21 sent a letter of intent to the Sunbelt broker, to Jeff. That is what formally allows us to begin

22 negotiations. I am not totally sure of the exact timeline of all of that but I know we have a letter

23 of intent that we signed that has a date on it. I don't recall if that was late August or early

Case 14-CA-152037 and 153558　　　　　　　　　　　　　　　　6/11/2015

1　September 2014, but at some point in time during that process we had to incorporate in order to
2　continue.

3　After everyone looked everything over and it looked feasible to get a loan, we sat down
4　and had another meeting with Andrew Foxhoven and Jeff Williams, where we further discussed
5　the business and the nature of the terms of the asset purchase. This meeting would have been
6　around the time that we incorporated. We began asking more questions about the business,
7　because after you sign the letter of intent, that is when you can start getting a lot more of the
8　financial information about the company and a lot more information about the business. I can't
9　remember if it was that first meeting with Jeff or it was at the second meeting with Jeff in late
10　September or early October 2014, whether or not the union first came up. The information that
11　was provided to us was that there were two or three employees who were members of the union
12　but it's not a big deal. He said it was a non-union company. There was not a contract with the
13　union. That is what Jeff told us during one of these two meetings. I can't remember if it was
14　that first meeting or the second meeting. Andrew Foxhoven was at both of those meetings.
15　There was another guy who came in and out of the meetings but he wasn't there the whole time.
16　I don't remember his name. He was just helping provide documents.

17　After the meeting where we found out that there were two or three union members
18　working at the company, but not contract, my parents and I had some discussions with our
19　attorney. We continued to pursue an asset purchase of the company because there was no
20　contract with the union.

- 4 -　　　Initials: JF

CONFIDENTIAL　　　Fox 0050

1　　　　At this point, we were working with SBA and our advisors to collect all of the paperwork
2　　　　and process all of the paperwork that is necessary to get the SBA loan and we set a closing date
3　　　　of October 31, 2014, which was approximately 4 to 5 weeks out at this point in time.

4　　　　We were getting closer to October 31, and we were getting more information about the
5　　　　company. We have been going back and forth with negotiations over the purchase agreement
6　　　　documents and we sat down to have another in person meeting to discuss all of the documents
7　　　　and to start discussing the transition. Get more information about the company so that we can
8　　　　start getting ready to step in to the ownership of the assets and run our new company. That was
9　　　　in late October 2014, about a week or week and a half before the initial closing date of October
10　　　31. It was during this time that Jeff said that there were more like 5 or 6 union members working
11　　　in the company and there may have been a contract that his dad had signed over 20-something
12　　　years ago. He said he didn't know anything about it because he didn't have a copy and hadn't
13　　　seen it. He did not say that he had signed a contact or that a contract was currently in effect.
14　　　After that meeting was over, we asked for copies of any contracts between Williams Restoration
15　　　Company, Inc. and the union. I believe that we went through Andrew. We did not have much
16　　　direct interaction with Jeff. Most of it was by proxy through Andrew. No contract was
17　　　provided. The response back was an unsigned boilerplate contract that you can download off of
18　　　the union webpage. I received that from Andrew. He said that is a union contract. I do not
19　　　know where Andrew received that contract from. To this day, I have not seen any contract that
20　　　has been signed by anybody – from a representative of Williams Restoration or the union.

21　　　At that point in time, the purchase agreement that we negotiated stated that there is not
22　　　and has not been for the past three years a contract between the seller and a union. It further
23　　　stated that there were no known disputes. There were three points in there but off the top of my

- 5 -　　　　　　　　　　　　　　　　　Initials: JF

1  head, those were the three [two] I remember. The change from the previous language to the current
2  language – at that point in time we had been speaking with Jeff and we were going back and
3  forth between us and Jeff, through Sunbelt, with the help of our advisors. Up until that point,
4  that language had been in the purchase agreement. After the point when Jeff said that his dad
5  may have signed something over 20-sometihng year s ago, after that meeting, we pushed back
6  the closing date to November 7, 2014, to give us more time to process the new information that
7  Jeff had given us about the possibility of his dad signing something a long time ago. We also
8  had to finalize some SBA paperwork. During that time is when the language under 3.10
9  "Organized Labor Matters" changed to the form that it currently exists. The reason for the
10 change was the disclosure of Jeff saying that his dad may have signed something 20 years ago
11 but Jeff still maintained that he did not have a contact with the union.

12  At this point, we looked into possible obligations of [and] everyone – Jeff, our attorney, and
13 Sunbelt all determined that because we were purchasing some of the assets of Williams
14 Restoration Company and were not assuming any of the liabilities of Williams Restoration
15 Company, it was not possible for any contract that his dad may have signed that no one has a
16 copy of, to transfer to us. Up through November 7, 2014, when we closed, it was maintained
17 that there was no current contract with the union. Jeff said it was only a few of the employees
18 who were members of the union, but they were just regular employees.

19  Prior to the closing, our accountant, towards the end, getting close to closing, had gotten
20 financial documents from Jeff that indicated that there were fringe benefits. But Jeff had said
21 that he had a few employees who were union members. There was no breakdowns. It was just a
22 lump sum figure on monthly financial statements that showed fringe benefits.

CONFIDENTIAL  Fox 0052

1       Next, we signed the closing documents on November 7, 2014, on the advice of everyone

2 that we would not be party to a union contract from an asset purchase. It was a partial asset

3 purchase. We did not purchase all of the assets. We did not acquire warranty work. There is a

4 section on liabilities and it says we are not acquiring Williams' liabilities. It explicitly mentions

5 contracts he may have. It caveats a contract with the security system company and DEX media.

6 We were going to complete existing work.

7       On Monday morning, November 10, 2014, we were introduced to the employees by Jeff.

8 It was agreed that Jeff would remain for four weeks to help advise us and show us about the

9 business and what he does and to introduce us to suppliers, business contacts, etc. We did not

10 have a meeting on Monday, November 10. As employees came in, Jeff introduced us to them

11 piecemeal. We were standing out back in the warehouse and as a guy came in, Jeff would

12 introduce us as the new owners to the company. He told the employees that we were good

13 people. Nothing really came up.

14       Not all of the employees showed up because they go straight to the job sites. We called a

15 meeting on Tuesday, November 11, 2014. We gathered all of the employees. We introduced

16 ourselves. Jeff said that he had sold the company and we talked about who we are and our

17 backgrounds. We didn't say anything related to the union. One of the employees asked us if we

18 were going to sign a contract with the union. I responded. At that point in time, everything was

19 so new, I said that we were working out our benefits package that we would offer the employees.

20 I did not state anything in regards to the union as to whether we were or were not going to sign a

21 contract. We didn't say that we wanted to make any changes but that we wanted to continue to

22 operate and we would not make any changes to the business structure. The current business

23 organizational structure, the way that we conduct the work. We needed to rely on their advice to

CONFIDENTIAL     Fox 0053

do all of that and we needed to learn from them. We didn't say anything about benefit packages at that time other than we were still finalizing everything. We assured the employees that we didn't want anyone to lose their jobs. That we wanted to hire all of the employees. We didn't make any comments about whether employees would have to fill out new paperwork or be hired by the company.

We handed a letter to all of the employees with their paychecks stating that we wanted to have a meeting about the benefits package. We were going to have employees fill out applications to be hired by the new company but we decided not to do that because the employees got nervous and we did not want them to leave and go somewhere else. So we did not have them fill out applications.

We went with the wage that the employees received under the previous company. During the first week, as we were setting up all of our new contracts that we had to set up to do business, we signed a new contract with a payroll company ("Paychex"). We told Paychecks not to take out any of the union dues. They set up the payroll without the union dues. We were looking at having another benefit package put in place. During that first week, we started talking health insurance with insurance agents.

The Friday where employees received their first paychecks from Fox Holdings, superintendent Doug Tiefenthaler opened up his check and saw that the union dues had not been taken out. He came into the office and was going on and on and on about if any of the guys who were in the union under Jeff kept working today, if they showed up to work and picked up their tools, that they would immediately lose insurance coverage. We sent all of the guys out to the job sites and they went to work, Doug included.

CONFIDENTIAL    Fox 0054

1   We were highly concerned about them immediately losing their insurance because that
2   was not information we had until that point in time. That if we did not pay their union dues, they
3   would suddenly and immediately lose their insurance upon picking up a tool on the job site. We
4   later found out that was actually false information, so Doug was misleading us. It was false as to
5   how quickly they would lose their insurance. We were very concerned about one of the guys not
6   having insurance coverage, particularly over the weekend, if they were to lose it that quickly.

7   We talked to Jeff and our attorney. We decided that we couldn't have the liability of
8   them getting hurt without insurance. We talked to the payroll company and told them to start
9   taking the dues back out and we began paying the union benefits. We thought we had to do that
10  so that the guys would keep their insurance and we wouldn't have the liability of them getting
11  hurt and not have insurance and not have the ability to get insurance or us provide them with
12  insurance. At that time, we were working on getting our own insurance. We had been talking to
13  insurance agents and had quotes.

14  We paid their union dues and paid into the fringe benefits that Williams Restoration had
15  paid into, including health and welfare, pension, and training funds. We thought it was an all or
16  nothing kind of thing. Jeff advised us. He was the previous owner and our major source of
17  advice on the company. He said just pay the dues and the guys will be able to have their
18  insurance, they will settle down and keep working and we won't lose any of them. He said to
19  focus on getting the work out the door and not on this stuff. He said we can do this for a little
20  while and when we get everything set up, we can have our benefits package and not pay the
21  union dues. At that time, we had two superintendents – Doug and Tyler Patterson. We also
22  learned that Doug and Tyler, under Jeff, were members of the union and were superintendents.
23  Jeff had told us that it was just workers who were in the union.

CONFIDENTIAL          Fox 0055

1    At the time, we told the payroll company to take the dues out of the next paycheck. The
2    payroll company then began deducting the dues out of the next paycheck. We told the guys not
3    to worry about their insurance because we were going to pay their dues.

4    During that time frame, either the second or third Thursday we were there, Jared Skaff
5    came into the office to talk to us. My mom and myself were the only officers present. Jeff
6    wasn't here. Dickey wasn't here. Jared came in to talk to us about the union. He provided us
7    with marketing documentation and discussed the benefits of being a union company. How
8    skilled the laborers are and all the training they get. Classes that owners of union companies can
9    take through the union. Classes members can take. He was trying to get us to sign a contract
10   with the union. He did not say anything about having an existing contract. He came in just to
11   talk about how great the union was and to provide marketing information and to talk to us about
12   signing a contract. He did not state that we had a contract. He did not state that there was
13   previously a contract. He provided us with no documentation about any contract. He came with
14   nothing except marketing documentation. He was encouraging us to sign a contract. He wanted
15   us to sign a contact and that was the purpose of him coming there. We talked to him and asked
16   him a few questions. We told him that we would look through the pamphlets that he provided
17   us. That was pretty much it. We told him we would look at his documentation. We didn't set
18   any other meetings. We didn't say we would keep talking, we just said we would look through
19   everything.

20   Jeff told us the next day, that he had talked to Jared and told him that we were brand new
21   owners and that we had a lot going on and we were just getting our feet wet in the industry and
22   we didn't have enough information to know whether or not we would want to sign a contract
23   with the union and that he needed to give us more time.

CONFIDENTIAL					Fox 0056

1    There was no further contact with any other union representative until Craig Hydeman in
2    early May 2015.

3    As early as November 12, 2014, we started looking for health insurance for employees.
4    We got our first quote on November 14, 2014. We continued to search for health insurance and
5    discuss health insurance until mid to late April 2015. At that time, we had tried multiple
6    insurance agents and were not able to provide any insurance because of the existing laws, the
7    Affordable Care Act. At the instructions of insurance agents, we did two surveys in December
8    2014, and March 2015. We informally talked to the employees and we weren't going to get
9    anywhere close to 75% participation that is needed. A lot of the guys wanted a paycheck and not
10   insurance and they were not interested.

11   I don't remember if I said [*if we were unable to provide insurance*] at a full company meeting but I was open with employees
12   about our search to be able to provide insurance and our difficulties to do so. I know definitively
13   that I spoke to individual employees. I don't recall if I said it at a companywide meeting. I did
14   say I was looking into it at a companywide meeting on multiple occasions. But we wanted to be
15   able to provide insurance to our employees and we tried to right away. To this day, we do not
16   provide health insurance to our employees. [*In April*] ~~At that time~~, we stopped seeking a companywide
17   insurance but we started looking at ways of individually having insurance for some of the
18   employees.

19   The decision to cease paying union dues and union benefits was made in April when we
20   found out that if you don't have a contract with the union it's illegal to pay benefits and dues.
21   But it was also the time that we were transitioning to get some of the individual insurance set up.

CONFIDENTIAL          Fox 0057

1   In mid to late April 2015, we had a meeting with the guys who we were paying the union
2   benefits. Up throughout all this time, our employees were asking us whether or not if we were
3   going to sign a contract with the union. They were asking us with regularity whether we were
4   going to sign a contract or not. We had numerous conversations with Doug. We found out that
5   it was illegal to pay the benefits without the contract and decided that we were not going to sign
6   a contract. We called a meeting to let them know that was what we were doing. At that meeting,
7   we said that we would continue to pay them their existing wages and then a couple of days later,
8   after we got some more information from the insurance agent, we told them that we would give
9   them all a $2/hour raise to help them pay for insurance. Two employees received that raise –
10  Fred Hover and Mike Peters. There was another individual, Raphael, and he is one of our best
11  employees. He was not happy about some of our other employees earning more than he did
12  despite the fact that he did a lot more than they did, so we offered him a higher raise. He got a
13  $5/hour raise or something to bring him in line with some of the other guys who still did less
14  than him.

15  Around May 5, 2015, I was in the office and Craig Hydeman came in and introduced
16  himself. He pulled out the same marketing documentation that I already had. I told him that I
17  already had copies of that. He said, "Yes, w~~ent~~ when Jared came to visit you." I said, "Yes, when
18  Jared was here." I can't remember specifically how it started but he had made some comment
19  about something and I stated back that I don't have a contract. I have never seen a contract. No
20  one has ever been able to provide me with any contract and we don't have a contract with you.
21  His response was, "Oh you don't think that you have a contract with us." I responded in the
22  affirmative. His next question was, "Why did you continue to pay the benefits?" I said,
23  "Because our employees were going to lose their insurance." He said, "Well, if you don't sign a

- 12 -                                          Initials: JF

1　contract with the union, your employees will lose their insurance." I said I was aware of that.

2　That was basically the end of the conversation. He said he would come back later with a

3　contract. He didn't show me anything at that time other than the marketing materials. Later that

4　day, my parents were in the office and Craig called and said he would be here in 15 minutes. He

5　showed up. We met him at the door. He handed us a "union contract." He said that we will

6　explicitly be interested in a section where it said that contracts with the union transfer at the

7　selling of the company. We took the contract and flipped to the back. It was not filled out.

8　There were no signatures. There was no employer listed. It was totally blank and the same thing

9　I can download off of the internet. We reiterated that we do not have a contract and have not

10　seen a contract. He said that we could go into arbitration. He didn't state why. We said if we

11　don't have a contract, how can we go into arbitration. We said he would have to take that up

12　with Jeff. It got a little more heated at that point in time. He was trying to intimidate us,

13　basically. I don't remember what was said, but I remember the feeling of it. And then he left.

14　　　　To this point in time, I have yet to see anything with any company information or

15　signatures. All I have is that Jeff said that 20-some years ago, his dad might have signed

16　something. At some point, Jeff told us that he had signed something. I learned this around the

17　time that Craig Hydeman came to the office or shortly thereafter. Jeff said that the union guy

18　came in, handed him a contract, and said, "Here, you have to sign this." He signed it and the

19　union guy took it and left and Jeff never got a copy. I first heard about this from my mother.

20　Jeff repeated it in front of both of us. He stops by periodically to get things and he was in the

21　office saying that the union was contacting him too.

22　　　　The Papillion Training Center (Carpenters Union Hall) was a job that Williams

23　Restoration Company bid with DR Anderson (DRA) prior to the closing. The bid was awarded.

CONFIDENTIAL Fox 0059

1   I don't know when that occurred. I wasn't informed when that occurred. The first time I heard

2   about the job was in December 2014. The first couple of months, my parents and I weren't very

3   involved in the day to day operations. The superintendents were handling all of the jobs. The

4   bid was awarded and we were obligated to work on it. These were some of the first contracts

5   that I had read. Doug Tiefenthaler told us that it had to be union wages. Doug was the

6   superintendent and he was directing all of the jobs. We sent the union members we were paying

7   union scale to work on that job. Doug advised us that work on the building structure itself was

8   what required that and the parking lot and exterior areas were considered public space, so the

9   union scale/wages wouldn't apply there. My understanding was that we were to have the union

10  scale on the job, so we sent the guys we were paying the union wages to work on that job. We

11  sent union scale workers to work on the building structure and non-scale workers to work on the

12  parking lot. Both superintendents, Tyler and Doug, were sending employees to that job. In April

13  2015, we completed substantially the work on the building itself. There is one piece left of

14  interior space and we will have to pay those employees union scale. They are also still pouring

15  parking lot areas.

16  Doug Tiefenthaler, when he started his employment with Fox Holdings, he was one of

17  the superintendents. His job duties included running our jobs from start to finish. That includes

18  the hand off from the estimator and then Doug decides which guys are going to go and work on

19  the job. He directs them as to what to do on the job. He communicates with the contracting

20  company with whom we are doing the job (general contractor). He negotiates change orders. He

21  purchases supplies. He runs the job. He finalized change orders, which are contracts. He would

22  go out and get new work and work with estimators to come up with numbers. I have copies of

23  some documents that I was able to get out of his email of him providing these changes orders to

CONFIDENTIAL        Fox 0060

the general contractors that he had negotiated with them. He told me about it, that it was going on, but he didn't need approval. He kept me in the loop; he kept me informed. He had the authority to hire employees. We have actual emails as proof. After a few months, we decided we wanted him to hire some people. He posted a Craigslist ad and he was the point of contact for that. The applicants responded to him. He conversed with them and decided which ones would come in and interviewed them. He hired one of them, Steve Sevener. Superintendents have the authority to discipline. He sent guys home from the job. He pulled them off jobs because they were not following procedures. An example was a job we had in Shenandoah, Iowa. The contractor down there wasn't happy with those guys and he talked to Doug about it. Doug pulled those guys off the jobs. He told me about it later. He had the authority to give raises. He and I had a discussion beforehand and he told me that it was time for Steve Sevener's performance review. He pulled Steve into the office. I was there when it happened, but I didn't have to be. Doug handled everything. Doug conducted the evaluation. Doug told Steve he was going to get a raise. Before the meeting, Doug told me that he needs to get a raise. Steve had only worked for Doug while he was with the company. It was Doug's decision to give Steve a raise. I did not have to give him the go ahead to give Steve a raise. Both of our superintendents gave people's raises. In fact, I didn't even know about some of the raises that were given.

Doug was handling all of the guys, negotiating change order contracts. He was the designated management liaison with all of the general contractors. He amended contracts. Doug had 20 plus years of experience in this company. He liked to boast that he started working at Williams Restoration before Jeff did under Jeff's dad. He ran the company for multiple weeks at a time when Jeff would leave for vacation. He knew everything about the company and its operations. We had our transition. Jeff introduced Doug and Tyler as the superintendent. Jeff

CONFIDENTIAL    Fox 0061

1  told Doug specifically, in front of us, that he would have to step up now because we don't know
2  this business and he would have to teach it to us.

3  Regularly, Doug Tiefenthaler, every couple of weeks, he would say something to us
4  about signing a union contract. He asked repeatedly if we were going to sign a contract with the
5  union and told us why we should sign a contract with the union. There were some comments that
6  were threatening in nature.   I found out after the fact from some of the employees that Doug
7  had been lobbying with some of the employees as swell. I found out that he was specifically
8  trying to prevent us from getting our 75% insurance level because he felt if we were unable to
9  provide insurance, more employees in the company would want to join the union and they would
10 have more force to get us to sign a contract.

11 When Doug left, he communicated directly to me, but my mom and Dickey were both
12 there as well as my bookkeeper Jean. He said he could not work here any longer if we weren't
13 going to sign a contract with the union and he wasn't going to get his union benefits. I was a
14 little surprised about it. I took his keys and asked him what that meant. He said he couldn't
15 work here anymore. I made the comment about him quitting and we had a form that we had
16 typed up about him not accepting our offer. He didn't say anything and he walked out the door.
17 This was after we had informed the employees that we were not going to sign a contract with the
18 union.

19 Mike Packet had already accepted a job as a manager at that point. We had already made
20 an offer to Doug Tiefenthaler - a similar offer to continue as a superintendent in a salaried
21 position instead of an hourly manager, which is what he was before, so he would get paid even

CONFIDENTIAL        Fox 0062

1 when the weather was bad and there wasn't much going on. We gave him vacation, which he
2 never had. The offer made to Doug was higher than Mike Packet's with similar benefits.

3 Tom Burford, Sr. worked for us as a bricklayer. When we were introduced to him by
4 Jeff, we were told that he was retiring on December 1, 2014. As that time approached, I made a
5 comment to Tom about him retiring. His response back to me was, "That depends on you guys."
6 I asked him what he meant. He said as to whether or not we sign a contract with the union. I
7 just kind of said, "Oh, okay." We didn't discuss that any further at that point in time. Tom
8 didn't work for a few weeks and then he worked again. As time was going on, Tom was asking
9 us more if we were going to sign a contract with the union, as did all the other union members.
10 My response would be that we were looking into it. That's all we said. we were open with
11 everyone about trying to get insurance. We got the IRA quick, I think in January 2015. We
12 have forms everyone filled out if they were signing up or not signing up.

13 Tom told us when we said that we weren't signing a contract with the union that he was
14 going to retire. He had been up front about that on multiple occasions. Later on Tom called me
15 and said that he had found out that he was fully vested in his retirement and was at 100%, and
16 wanted to know if we might be interested in him still working for us. He said he still had some
17 things to look into. We said yes, we would be interested in talking to him about that. There
18 were maybe three or four weeks that he didn't work for us, and then, through his son, he asked if
19 he could come back to work at $29/hour and he would handle his own insurance. He had found
20 out that he wouldn't get his pension until he was 65 and the union was going to fine him
21 thousands of dollars if he worked for us. He resigned from the union so that he could come back
22 and work for us and not be fined and still get his retirement. He said that the union had
23 threatened him, that if he worked for us, they would fine him thousands of dollars. We brought

CONFIDENTIAL    Fox 0063

1   him back on board as kind of part-time. He works whatever is available and when he is

2   available. He is currently employed by the company.

3   Darwin Montalvo was a laborer. He had been hired by Jeff about a month before we

4   bought the company. Mike Packet, as a superintendent, called me on the phone and told me that

5   th contractor had called him saying that our guy had stole one of his hammer drills. Mike wanted

6   Darwin to get fired. Mike is pretty timid because he is so new, but I have been telling him that

7   we have to make sure that we discipline the guys, if they are not working, send them home. I

8   have told him numerous times in the last several weeks that he can discipline the guys and he

9   doesn't have to ask me permission for everything and he can just go and handle the jobs and the

10  guys. With Darwin, Mike said he needed to be fired. I said, "Okay, if you think he needs to go,

11  then we will fire him." The next day, both of us were there. We were concerned about getting

12  our tools back. We asked him what tools he had and asked if we could see him. He opened up

13  the trunk of his car and we asked to get the tools back. He then asked if he was getting fired.

14  Both of us said yes. He talked to me a little bit individually and to Mike a little bit individually.

15  I fired Darwin based on Mike's recommendation without doing any further investigation myself.

16  We have also hired eight people based on Mike's recommendation. I have not had any

17  interviews with anyone without Mike being there telling us what he wants us to do. We have

18  hired eight guys who Mike has sat in on interviews with and two of them were people he

19  specifically recommended apply to the company and the others we hired were people that our

20  other superintendent, Tom, recommended apply to the company and Tom sat in on those

21  interviews too. Mike and/or Tom need to make a recommendation for us to hire someone.

22

CONFIDENTIAL      Fox 0064

1

I am being provided a copy of this Confidential Witness Affidavit for my review. I understand that this affidavit is a confidential law enforcement record and should not be shown to any person other than my attorney or other person representing me in this proceeding.

I have read this Confidential Witness Affidavit consisting of 19 pages, including this page, I fully understand it, and I state under penalty of perjury that it is true and correct. However, if after reviewing this affidavit again, I remember anything else that is important or I wish to make any changes, I will immediately notify the Board agent.

Date: 6/11/2015     Signature: _Jordan Fox_____
                                Jordan Fox

Signed and sworn to before me on June 11, 2015,     at

Papillion, Nebraska
_____
WILLIAM LEMASTER
Board Agent
National Labor Relations Board